[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
OCT 27, 2000
THOMAS K. KAHN
CLERK

No. 98-3562

D. C. Docket No. 96-00104-CR-FTM-25D

UNITED STATES OF AMERICA,

Plaintiff-Appellees,

versus

JOHN ROBERT DOHERTY,
DOUGLAS GLENN HATTER,
JAMES WILLIAM GAUDET,

Defendants-Appellants.

Appeals from the United States District Court
for the Middle District of Florida

**(October 27, 2000)**

Before COX and HILL, Circuit Judges,  and NESBITT*, District Judge.

_____
*Honorable Lenore C. Nesbitt, U.S. District Judge for the Southern District of Florida, sitting by designation.

HILL, Circuit Judge:

A jury convicted John Doherty, Douglas Hatter, and James Gaudet of conspiracy to defraud the Internal Revenue Service , 18 U.S.C. § 371. The jury also convicted Doherty on one count of making false statements to the Internal Revenue Service, 26 U.S.C. § 7206, and Hatter on two counts of making false statements before a grand jury, 18 U.S.C. § 1623. All three defendants appeal their convictions.

## I.

In this case, the government alleged a multi-state conspiracy to defraud the United States by impeding and impairing the Internal Revenue Service (IRS) in its function of ascertaining and collecting federal excise taxes on sales of diesel fuel purchased for highway use. Diesel fuel used in vehicles traveling on public highways ("on-road") is subject to state and federal excise taxes. The same fuel, if used in marine shipping ("off-road"), is not subject to the excise tax. A wholesaler who intends to sell fuel for "off-road" use can purchase the fuel tax-free from a refinery if he obtains a "Form 637" IRS exemption.

In the summer of 1989, Raymond Young obtained a Form 637 certificate of exemption for his business, Dry Tortuga Marine, Inc. (DTM), headquartered at Marco Island, Florida. At that time, Young owned a motor vessel named the "Dry

2

Tortuga" and informed the IRS that he intended to use the ship "to fuel boats on the high seas."[1]  Young purchased diesel fuel for off-road use, without paying the excise taxes, and delivered it for re-sale to his own on road retail outlets, including convenience stores (Travelstops) and truck stops (Fuel Depot).  Young employed John Doherty, Douglas Hatter and James Gaudet to drive DTM's fuel trucks.  Subsequently, Young made Doherty a manager of two of the Travelstops and a Fuel Depot in New Orleans, giving Doherty a 25 percent interest in the Fuel Depot.[2]

In 1990, Young became a confidential informant ("CI") for the Joint Federal and State Excise Tax Task Force (Joint Task Force).  On February 26, 1990, John Moritz, an agent with the Texas Comptroller's Office and FBI Agent Chris Smith formally designated Young as a CI.  In a tape-recorded conversation on February 26, 1990, Agent Moritz told Young that, while he would have to pay income taxes on his business operations, he could "play games with" the excise taxes owed on his diesel purchases.  On March 29, 1990, Young entered into a written immunity agreement.

---

[1]DTM was also involved in the hauling of diesel fuel in Houston, Texas and New Orleans, Louisiana.

[2]Young's wife, Anne, indicted in this case, retained the remaining 75 percent interest in Fuel Depot and was the 100 percent owner of the Travel Stop stores.

The record is unclear how long Young continued to cooperate with the Joint Task Force as a confidential informant. In 1991, however, IRS Special Agent Richard Ruka initiated a criminal investigation into Young's business, DTM, after receiving information that large amounts of currency were being deposited into its bank accounts in Marco Island, Florida. During surveillance of DTM's Marco Island office, federal agents observed almost daily deliveries of Federal Express parcels. After obtaining permission from Federal Express to x-ray the parcels, Ruka discovered that they contained currency. Rukka's investigation subsequently revealed that the currency was the proceeds of DTM's diesel fuel sales to on-road service stations in New Orleans and Houston. In 1992, Young and two others were indicted in connection with Young's diesel fuel operations in Florida, Texas and Louisiana.

In January 1993, Young was found guilty. His bond was continued prior to sentencing, however, and he disappeared while scuba diving.[3]

Almost four years later, on December 11, 1996, the instant indictment was returned in Fort Myers, Florida charging Young's truck drivers with participating in the conspiracy from 1989 to mid-1994.[4] Doherty, Hatter and Gaudet were

---

[3]All parties agree that Young is probably a fugitive in Costa Rica.

[4]Also charged were Ann Young and James Lee. Lee, a diesel fuel purchaser, entered into a plea agreement with the government and testified against these defendants at trial. Ann Young apparently fled to Costa Rica to join her fugitive husband and was never tried.

charged with conspiring with Young to obtain the Form 637's, by creating fictitious sales invoices and records and providing false business records to the IRS. Doherty was also charged with making false statements to the IRS by filing a false corporate tax return for Fuel Depot, Inc. In addition, Hatter was charged with two counts of lying to the grand jury about where he delivered the diesel fuel.

II.

Prior to trial, the defendants moved to dismiss the indictment on the grounds that they were unaware of the conspiracy and were entrapped by Young – who had been immunized from prosecution – into participating in the scheme. They argued that they relied upon the public authority Moritz granted Young not to pay taxes and so had no criminal intent. The district court denied the motion as a matter of law, but stated that the defense was a factual one appropriate for resolution by the jury at trial. The government agreed.

Doherty also filed a motion to sever his case from that of his co-defendants. In support of this motion, he argued that the government's notice of intent to introduce the testimony of IRS Special Agent Robert Zavadil relating incriminating statements by Gaudet violated Doherty's Sixth Amendment right to cross-examination as defined in *Bruton v. United States*, 391 U.S. 123 (1968). The district

court denied this motion, stating that it found no *Bruton* violation because the testimony did not specifically inculpate Doherty.

At trial, the government presented a largely circumstantial case. The government's first witness, IRS Special Agent Richard Ruka, explained how the scheme worked. Young, he testified, obtained untaxed diesel fuel by using Form 637 certificates and directed his truck drivers to deliver the fuel to retail gas stations. He explained that a wholesaler who obtains fuel with a 637 certificate but ends up selling it for on-road use must file a Federal Quarterly Excise Tax Return, Form 720, and pay any federal excise taxes due. Young, however, never made the required tax payments.

On cross-examination, Ruka acknowledged that he did not know whether any of these defendants knew if Young ever filed subsequent Form 720's or whether they ever received any of the profits from the alleged conspiracy. He also acknowledged that Agent Moritz had authorized Young to "play around with the taxes, the excise taxes." Finally, he confirmed that, after Moritz testified as a defense witness in the Young trial, he was indicted by the government, but he was found not guilty on all counts.

After Agent Ruka, twenty-seven witnesses testified regarding the activities of Young and DTM between 1989 and 1991. The testimony was that Young, Robert

6

Sheehan (a bookkeeper), Tom Rottele (a bookkeeper), Mohammed T. Ahmad (a fuel broker), William Frederick (owner of a Shell station), B.C. Hamilton (owner of Hamilton Oil), and James K. Lee ( a manager of a seafood wholesaler) all were involved in the preparation of false records and tax returns to hide the scheme. None of these witnesses, however, testified that any of the defendants in this case had knowledge of Young's failure to pay the excise taxes on the fuel they were hauling. Ahmad testified he had discussed the creation of false records for the fuel purchases and sales with Young while Doherty was in the same room, but could not state that Doherty heard his discussion.

The false tax returns were all prepared by Young's accountants in Marco Island. The testimony was, however, that Doherty supplied accurate records from his New Orleans operations to these accountants. There was no evidence from these twenty-seven witnesses that any of these defendants received any of the proceeds of this scheme.

The government then called Special Agent Zavadil to testify. Doherty renewed his *Bruton* objection to Zavadil relating Gaudet's "confession."[5] When

_____

[5]Gaudet also objected to the introduction of this testimony alleging that the government had failed to provide it to him by February 15, 1997 as required by the Standing Discovery Order. The government did not produce Gaudet's December 11, 1993 extrajudicial incriminating statement until *the third day of trial*, ln July 27, 1998. The prosecutor claimed that he had mailed a copy of the statement in March of 1998, and the district court accepted this representation and overruled the objection.

asked by the court what in Gaudet's statement incriminated Doherty, Doherty's

counsel read from Zavadil's notes of his conversation with Gaudet:

> Gaudet stated that he would get his instructions on where to deliver the
> fuel from Ray Young or Doherty; all paperwork would go to John
> Doherty; that Gaudet stated he knew what he was doing was illegal;
> that he stated he was followed for about a seek, Gaudet took this
> information to John Doherty . . . .

The government responded that:

> Yes, these are prejudicial to the defendant and they help prove the
> government's case, but it's not – it's not *Bruton* by no means. *Bruton*
> is a clear confession, you know. Well, Your Honor, I'd be very happy
> if there was a confession here, and I'd love to introduce that. But what
> I have is that Gaudet stated that there came a time when he knew what
> he was doing was illegal. I'm not sure that's a confession, and I
> certainly don't see how that involves any *Bruton*.

> The court ruled that Gaudet's statement "does not directly implicate the other

co-defendants." The court further denied Doherty's request that the statement be

redacted to delete the references to Doherty, stating:

> I don't see the *Bruton* problem. I don't see the problem with Mr.
> Doherty. And as I've indicated, I'm going to deny your motion and
> I'm not deleting anything.

Agent Zavadil was then called and testified as follows:

> He [Gaudet] stated that he received instructions from – as to what to
> pull and where to deliver –  from Mr. Young and Mr. Doherty. He also
> stated that all the paperwork from the fuel loads was given to Mr.
> Doherty and that he very rarely ever saw Mr. Young. He said there
> came a time when he realized that what he was doing was illegal, and
> that that occurred prior to the time that the Internal Revenue Service

executed a search warrant on Fuel Depot in October 1991. He also advised that around the same time he realized that he was being followed and he had told Mr. Doherty that he was being followed, and Mr. Doherty at the time told him that Dry Tortuga Marina was under investigation by the Internal Revenue Service.

The government's last witness testified that he had totaled the various invoices introduced into evidence to determine the total amount of excise tax that Young had failed to pay.

On the morning of the sixth day of trial, a series of bizarre events occurred. The court on its own motion, suddenly called John Moritz, who was standing by ready to testify for the defendants, to the stand. Outside of the presence of the jury, the district judge asked Moritz if he had spoken with Special Agent Zavadil the previous day. Moritz said that Zavadil approached him outside the courtroom and threatened him. Zavadil told Moritz that if he testified for the defense he would probably be indicted again.[6]

All defense counsel immediately moved for a dismissal of the indictment or a mistrial for prosecutorial misconduct. The court called Zavadil in and questioned him about the alleged threat to Moritz. Thereafter the court made the following statement:

---

[6]Moritz had testified against the IRS in one of the previous Young trials and had thereafter been indicted for perjury. He was subsequently acquitted.

Well, I think Mr. Moritz is telling the truth. I think Mr. Zavadil did make the statement that if he testified, that he'll probably be indicted again. I think it's threatening. So that's my finding on that issue. He had no business in there discussing this testimony with this witness. And he's an experienced agent. He knows better. He didn't have to. He went in and threatened him.

. . .

Now, having said that, I don't know what sanctions to impose. I don't know if this justifies a mistrial or a dismissal or striking of the testimony. I'll take that under advisement as well as the motions for a directed verdict or judgment of acquittal insofar as Mr. Hatter and Mr. Gaudet is concerned.

At this point, the jury was brought back in, and counsel for Gaudet and Hatter rested in anticipation that Doherty would call, Moritz, which he immediately did. The prosecutor objected and asked for a side bar. Although both the court and the government had previously agreed that the "public authority" defense was a factual issue appropriate for resolution at trial,[7] government counsel now objected to Moritz's testimony asserting that the court had already rejected this defense when it denied the motion to dismiss.[8] Defense counsel reminded the court that it had already said that this testimony could be presented at trial, and that, furthermore, Moritz's testimony would raise the additional affirmative defenses of estoppel and

---

[7]There had even been an in-court discussion of what documents would be introduced into evidence through the Moritz testimony.

[8]The government's change of heart appears to have been an effort at damage control. To avoid a mistrial, the government argued that Moritz's testimony was irrelevant and should be excluded and, therefore, Zavadil's threats against a non-witness were harmless.

10

entrapment defenses not resolved by the motion to dismiss. The district court, perhaps in an effort to nullify the Zavadil threat and despite its prior indication that the "Moritz defense" would be permitted, excluded Moritz's testimony.

At this point, Gaudet's counsel requested permission to call Moritz for the limited purpose of establishing Zavadil's threat against Moritz. Defense counsel argued that Moritz's testimony was crucial in this regard in order to impeach the credibility of Zavadil's testimony, especially insofar as it related Gaudet's incriminating comments. The court refused permission, noting that Gaudet had already rested and rejecting Gaudet's explanation that he did so in reliance on the court's and government's prior statements that Moritz would testify at trial. Then, the court announced that it would strike all of Agent Zavadil's testimony. This decision obviated the need to call Moritz to the stand as the court announced it would instruct the jury not to consider Zavadil's testimony. All defense counsel then requested the following instruction to the jury:

> Based upon certain actions taken by IRS Special Agent Robert Zavadil, prosecution witness called yesterday in this case, this Court has decided it will strike Robert Zavadil's testimony and instructs you not to consider his testimony whatsoever.

The court denied the instruction. After the jury returned, the court announced that closing argument would begin. During the first part of the government's summation the prosecutor was going through various exhibits, when defense

11

counsel objected to some invoices on the grounds they were not in evidence.  The

court then stated:

> All right.  I'm going to overrule your objection. Folks, as I've already
> previously instructed you, you are to rely on your own independent
> recollection of the testimony and the evidence presented in this case.
> *Also earlier during the trial, you've heard certain testimony from
> Agent Zavadil, IRS Agent Zavadil.  I have stricken that testimony from
> the record.  That, therefore, means that you are to disregard the
> testimony that he's presented in this courtroom.  Let's proceed.*

The court took no other curative action, and did not address Zavadil's testimony in

the jury instructions at all.

The defendants were convicted on all counts.  They urge several issues on

appeal, including the introduction through Zavadil of Gaudet's "confession" and the

subsequent handling of the Zavadil threat.  They also argue that the evidence of

their guilt on all counts  was insufficient, especially the conspiracy count in view of

the fact that Zavadil's testimony – the only direct evidence that they knew what

they were doing was illegal – was stricken.

III.

In *Bruton*, the Supreme Court held that the admission of a confession or

statement by a non-testifying defendant which inculpates a co-defendant violates

the co-defendant's Sixth Amendment right to confront a witness.  *Bruton v. United

States*, 391 U.S. 123 (1968).  This court has read *Bruton* to exclude statements by a

12

non-testifying co-defendant which directly inculpate a co-defendant. *United States v. Beale*, 921 F.2d 1412, 1425 (11th Cir. 1991) (citing *United States v. Satterfield*, 743 F.2d 827, 849 (11th Cir. 1984).

Gaudet's statement, on its face, inculpates Doherty. In it, he admits he knew what he was doing was illegal and identifies Doherty as the individual who was giving him instructions on how to perform his illegal conduct. The government acknowledges that "Gaudet's statements named Doherty and linked Doherty to the transactions at issue."[9] It is difficult to see how Gaudet's statement could more "expressly implicate[ ] the defendant as his accomplice." *See Richardson v. Marsh*, 481 U.S. 200, 208 (1987). The statement, therefore, is inculpatory and Doherty was prejudiced by testimony he was not allowed to cross-examine. *See United States v. Veltmann*, 6 F.3d 1483, 1501 (11th Cir. 1993). The district court's instruction to the jury to consider Gaudet's statement against him only, does not cure the prejudicial effect of the testimony because:

> [T]here are some contexts in which the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored. Such a context is presented here, where the powerfully incriminating extrajudicial statements of a codefendant,

---

[9]We find the government's argument that there is no *Bruton* problem because Gaudet said nothing about Doherty's state of mind, and, therefore, were not "powerfully incriminating" unpersuasive.

13

> who stands accused side-by-side with the defendant, are deliberately spread before the jury in a joint trial . . . .

*Bruton*, 391 U.S. at 135-136 (citations omitted).  Accordingly, we hold that a *Bruton* violation occurred when Gaudet's facially incriminating statement was admitted.

Nor do we have any difficulty in deciding that this error was not harmless.  A *Bruton* error is harmless only if the properly admitted evidence of guilt is so overwhelming, and the prejudicial effect of the co-defendant's statement so insignificant, that beyond any reasonable doubt the improper use of the statement was harmless.  *Beale*, 921 F.2d at 1425.  In this case, although the evidence at trial as to *Young's* guilt was overwhelming, as to *these defendants* the evidence was far from overwhelming.  The only direct evidence against these defendants was Gaudet's statement implicating himself and Doherty.  There was no other direct evidence whatsoever that these defendants knew that they were participating in a tax fraud conspiracy.  Furthermore, even the circumstantial evidence of their guilt was limited.  There was no evidence at all that they ever read and/or understood the meaning of the significance of the "off-road" designation on the invoices they presented when they picked up the fuel.  There was no evidence that Doherty knew that Fuel Depot's 1990 corporate tax return, prepared by Young's accountants in

14

Marco Island, was false[10] or that any of these defendants ever saw or knew anything about the tax returns that Young filed from Marco Island.  There was no evidence they received any payment above and beyond their salaries for hauling the fuel. Although the evidence that defendants sometimes changed the identification signs on their truck doors prior to re-delivery of fuel, and the jury could draw an inference of guilt from this evidence, defendants' evidence offered a plausible innocent explanation.[11]

In view of the limited evidence from which the jury could legitimately infer, rather than speculate, that these defendants knew they were engaged in a tax fraud conspiracy (since hauling fuel is not in and of itself illegal), we cannot agree with the government that Gaudet's statements had "minimal significance."  On the contrary,  Gaudet's incriminating statement probably had a profound effect on the jury.  It essentially nullified the theory of the defense that Doherty, Gaudet and Hatter were merely truck drivers used by Young to accomplish his tax fraud scheme.

The Supreme Court has noted that "[s]pecific testimony that 'the defendant helped me commit the crime' is . . . difficult to thrust out of mind."  *Richardson*,

---

[10]Doherty, however, signed the fraudulent tax form and may be charged with knowledge of its contents. *United States v. Olbres*, 61 F.3d 967, 971 (1st Cir. 1995).

[11]The trucks made deliveries to different stations and the name on the truck was supposed to correspond to the delivery destination.

481 U.S. at 208. In fact, the admission of such testimony is error precisely because "the jury can [not] possibly be expected to forget it in assessing the defendant's guilt." Where the other evidence of guilt is wholly circumstantial and far from overwhelming, this testimony is not harmless. *See Beale*, 921 F.2d at 1425.

Nor was the *Bruton* error cured by the trial court's later decision to strike Zavadil's testimony. Just as the jury cannot reasonably be expected to ignore the testimony's incrimination of Doherty, nor can they be expected to forget Gaudet's "confession" merely because the district court, in the midst of the prosecution's summation and in the context of ruling on an objection to an exhibit, directs them to disregard Zavadil's testimony.[12]

Furthermore, even though stricken, government counsel was permitted to restate Zavadil's testimony in his summation by asking rhetorically:

> When you think about . . . whether he [Gaudet] knew what he was doing was illegal . . . I'd like to point out that the search warrants in this case were executed on October 25, 1991 . . . . Did he know that this was illegal? Ask yourselves.

Finally, had Zavadil's testimony not been stricken, defendants would have been entitled to have Moritz testify to the threat as impeachment evidence. *See United States v. Scheer*, 168 F.3d 445, 452 (11th Cir. 1999) (prosecutor's threat to

---

[12]See page 8 *supra* for the district court's handling of the Zavadil testimony.

witness constituted material impeachment evidence which jury was entitled to hear). Such impeachment might have seriously undermined the critical effect of Zavadil's testimony by evidencing his personal interest in the outcome of the trial. *Id*. In this way, the jury, which could not forget the testimony, might have been induced to disregard it.

For the foregoing reasons, we conclude that the admission of Zavadil's testimony, as well as its subsequent striking and an off-hand remark to disregard it, was error as to Doherty and the error was not harmless.[13]

## IV.

Next, we consider the impact of Zavadil's threat to Moritz and the subsequent striking of Zavadil's testimony. In denying defendants' motion to dismiss, the district court held that although the "Moritz defense" of lack of criminal intent did not entitle the defendants to dismissal as a matter of law, that this issue was a factual one for the jury to resolve at trial. The district judge told the defendants that: "I think you should be able to present it as [a] factual defense." The government agreed with the court, stating, "I think that, yes, it's a factual defense that they can present." Immediately prior to jury selection, the court and

_____

[13]We do not consider Doherty's assignment of error in his sentencing inasmuch as we vacate his underlying convictions.

17

government again agreed that the defense was entitled to call Moritz to present their theory of "innocent entrapment."

In reliance on these assurances, the defendants arranged for Moritz to travel from Texas to Florida to testify on their behalf. Unfortunately for them, while Moritz was waiting outside the courtroom to testify for defendants, the government's star witness, IRS Special Agent Zavadil, told Moritz that if he testified for the defendants he would be indicted again. The district court, in an obvious attempt to remedy this disastrous turn of events, decided to strike the testimony of Zavadil and exclude Moritz from testifying.

As the result of these events, defendants were unable to use Moritz to impeach Zavadil. Gaudet argues that Zavadil's testimony was the only direct evidence against him and its effect on the jury had to have been devastating. Gaudet sought to impeach Zavadil through Moritz by evidence of the threat from which the jury could properly infer that Zavadil was an overzealous government agent who appeared to have a personal stake in the outcome of this trial. Such an inference could have produced a different verdict as to Gaudet, and for this reason we conclude that the exclusion of the Moritz impeachment testimony was reversible error as to Gaudet.

V.

18

All defendants argue that their convictions must be reversed, not merely vacated, because the evidence of their guilt on all counts was insufficient to sustain the jury's verdict, especially since Zavadil's testimony relating Gaudet's "confession" was struck. As discussed above, although the evidence at trial as to *Young's* guilt was overwhelming, as to *these defendants* the evidence was far from overwhelming. The only *direct* evidence against these defendants was Gaudet's statement implicating himself and Doherty. There was no other direct evidence whatsoever that these defendants knew that they were participating in a tax fraud conspiracy. Furthermore, even the circumstantial evidence of their guilt was limited.

As to Gaudet and Hatter, the evidence was that Young instructed them to haul fuel from fuel depots to his customers. Gaudet and Hatter presented invoices for the fuel which often contained the notation "off-road use." They occasionally changed the signs on their trucks from DTM to the name of the customer to whom they were delivering the fuel.

What the evidence did *not* show, however, was that either Gaudet or Hatter ever read and/or understood the meaning of the significance of the "off-road" designation on the invoices. Nor was there any evidence that even if they understood the meaning of the term "off-road," that they had any knowledge of the

19

tax implications of the term. Nor did the evidence show that they ever saw any tax returns filed by Young or knew whether he had paid or was going to pay the excise taxes when he filed. Nor did the government produce any evidence that either Gaudet or Hatter ever received any payment above and beyond their salaries for hauling the fuel.

Gaudet and Hatter may well be guilty of conspiring with Young to avoid federal fuel excise taxes. If so, the government's evidence did not establish that guilt beyond a reasonable doubt in this case and such a finding by the jury was not authorized by the evidence. The evidence from which the jury could legitimately infer, rather than speculate, that Hatter and Gaudet knew they were engaged in a tax fraud conspiracy (since hauling fuel is not in and of itself illegal), was insufficient and we conclude that their convictions on Count I are due to be reversed.

As to Doherty, however, we conclude that the evidence of his supervisory role, his signing of the false tax return, and his presence in the room when the illegality of the scheme and the false records were discussed supports the jury's finding that he was a conspirator. Although we vacate his conviction because of the *Bruton* error, the evidence was sufficient to permit the government to retry him if it so chooses.

VI.

20

Finally, we consider Hatter's claim that there was insufficient evidence at trial upon which the jury could reasonably have convicted him of the two counts of lying to the grand jury. The government produced two witnesses to support its allegations that Hatter lied to the grand jury regarding where he delivered fuel. Hatter claimed to have delivered the fuel to barges located at three different locations along the Mississippi River in New Orleans. According to Hatter, the testimony of these two witnesses directly contradicted each other with respect to one of these delivery sites, and the government produced no evidence at all with respect to the other two sites. Furthermore, one of these witnesses testified that photographs he took of these sites which Hatter claims would support his contention that he told the truth regarding his deliveries were sent to Agent Ruka and subsequently disappeared.

We have reviewed this testimony carefully and conclude that any inconsistencies in the government's evidence was for the jury to resolve. The evidence was not so tainted as to be inadmissible or completely unreliable. While the evidence of guilt on these charges is, again, not overwhelming, we conclude that it was sufficient to satisfy the "substantial evidence" standard. *See United States v. Clavis*, 977 F.2d 538 (11th Cir. 1992).

VII.

For the forgoing reasons, defendants' convictions on Counts I and III are VACATED. As to Counts IV and V, Hatter's convictions are AFFIRMED. The case is REMANDED.