[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JAN 11, 2007
THOMAS K. KAHN
CLERK

_____

No. 05-14388

_____

D. C. Docket No. 04-00020-CR-HL-7

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

TRELLINY T. TURNER,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Middle District of Georgia

_____

**(January 11, 2007)**

Before CARNES, MARCUS and KRAVITCH, Circuit Judges.

MARCUS, Circuit Judge:

Trelliny T. Turner appeals her convictions and 240-month sentence for

multiple offenses arising out of her role in the theft of approximately $266,000

from a U.S. Post Office in Valdosta, Georgia on September 3, 2004. On appeal, Turner argues that the district court erred by admitting hearsay testimony, in violation of Bruton v. United States, 391 U.S. 123 (1968), and that her sentence, which was above the Sentencing Guidelines advisory range, was unreasonable. After thorough review, we affirm.

I.

The procedural history and relevant facts adduced at trial are these. On February 17, 2005, Turner and two co-defendants -- William Broxton ("Broxton"), who was Turner's live-in boyfriend and the father of her youngest child, and his uncle, Robert Broxton -- were charged in a multi-count superseding indictment. Turner was charged with the following crimes: conspiring to steal U.S. Mail, in violation of 18 U.S.C. §§ 371, 1708 (Count One); theft of U.S. Mail, in violation of 18 U.S.C. § 1708 (Count Two); interstate transportation of stolen cash from Valdosta, Georgia, to Newark, New Jersey, in violation of 18 U.S.C. § 2314 (Count Three); engaging in conduct misleading to a law enforcement officer with the intent to hinder, delay, or prevent communication of information relating to the commission of a federal offense, in violation of 18 U.S.C. § 1512(b)(3) (Count Six); and two counts of money laundering, one arising out of the use of proceeds of the theft to purchase a Ford Explorer (Count Seven), and the other arising out of

2

the use of proceeds of the theft to purchase a Chevy Suburban (Count Eight), both in violation of 18 U.S.C. § 1957.[1] Turner and William Broxton were tried together, after which Turner was convicted by the jury of Counts One through Three, Six, and Eight, but acquitted on Count Seven, and William Broxton was convicted of Counts One through Five and Counts Seven through Ten.[2]

At trial, the government introduced the testimony of over forty witnesses, primarily consisting of law enforcement officers, Turner's co-workers, and salespersons from whom Turner or Broxton, or both, had purchased goods with large sums of cash in the weeks following the theft. The government also presented the testimony of two witnesses to whom Broxton had made statements admitting his involvement in the theft. During the direct testimony of both, they recounted to the jury extrajudicial statements in which Broxton incriminated not only himself, but also Turner, thereby giving rise to the substantial Bruton claim which forms the main issue on appeal.

The government's evidence established the following. At approximately 9:55 p.m. on Friday, September 3, 2004, two people entered a U.S. Post Office in

---

[1] Broxton also was charged in Counts One, Two, Three, Seven, and Eight, and was charged alone in Count Four, possession of a firearm by a convicted felon; Count Five, the making of misleading statements to law enforcement; and Counts Nine and Ten, possession with intent to distribute crack cocaine. Robert Broxton also was charged in Counts One, Two, Three, and Seven.

[2] Robert Broxton was a fugitive at the time of trial. He was arrested on February 16, 2006. He pled guilty to Count One and was sentenced to a 60-month term of imprisonment.

Valdosta, Georgia. At that time, there was only one clerk on duty, Larry Templin, who recently had undergone eye surgery, was elderly, and otherwise did not have good eyesight. Templin observed one of the individuals enter the "registry cage," which is a locked area enclosed in wire-mesh, where registered mail and other valuable items are secured, while the other individual stood outside of the cage. Templin immediately exited the post office and called the police, but could not provide a meaningful description of the two individuals.

By the time the police arrived, the suspects were gone. The officers discovered that a rear door into the facility was unsecured, but there was no sign of a forced entry. Thus, from the start, the police viewed the crime as an "inside job." The unsecured rear door led from a men's restroom into the postal facility. The restroom also had an exterior door to the outside loading dock behind the post office, as well as an interior door which provided access from the bathroom into the rest of the facility, and, most immediately, into an employee breakroom. The exterior door was always kept unlocked so that the restroom could be used by postal-truck drivers who stopped at the facility's loading dock for pickups and deliveries. Notably, the interior door had a push-button combination lock, and the door was kept closed and locked when not in immediate use.

4

According to Templin, the three-digit code was widely known by postal employees who had used that bathroom or that entrance to gain entry into the facility. Indeed, the government presented the testimony of numerous co-workers who also testified that the combination was common knowledge among the postal employees.

Linda Kathleen Combs, a distribution clerk who worked the shift with Turner beginning at 11:00 p.m. on the night of the theft, testified that during the shift, Turner appeared nervous and asked Combs an unusual series of questions such as what the postal inspectors' success rate was in solving such cases, and whether the inspectors could access bank accounts and financial records in the course of their investigation. Combs also testified that everyone knew the combination to open the interior door. A few days after the theft, Combs and several co-workers, including Turner, were discussing the fact that the authorities were investigating the crime as an "inside job." During the conversation, there was some talk about how everyone in the facility knew the combination to open the door, to which Turner volunteered that she did not know the combination and did not want to know it.

David Ike Dempsey, another distribution clerk, also worked with Turner the night of the theft. He perceived her as "jumpy" when he arrived for his shift that

night.  Notably, Dempsey also testified -- contrary to Turner's statement to Combs and Turner's own trial testimony where she denied knowing the code -- that, on numerous occasions, he had seen the defendant go into the bathroom from the breakroom and then reenter using the combination.

Templin described how at the time of the theft, Turner had worked for the Postal Service in Valdosta for about nine years.  From time to time, including a few times during the preceding month of August 2004, Turner had worked in the registry cage.  On the day of the theft, Turner was scheduled to relieve Templin at 11:00 p.m. and work until 7:00 a.m.  Templin also stated that the work schedules were posted and accessible to all employees.

An inventory of the robbery scene later revealed that 28 of some 30 bags were missing from the registry cage.  The bags that were placed in the cage generally contained cash, money orders, and checks from postal patrons as well as check-lists and bank-deposit slips.  Because the robbery occurred on a Friday, which was payday for many customers, and because it was the third day of the month, when many government checks, including Social Security checks, are received and money orders are purchased, the deposits were much larger than usual.  In all, more than $266,000 was taken from the Post Office.

The trial evidence also established that Turner and William Broxton had been in a relationship for some period of time, and were living together at the time of the crimes. Turner's gross income for the prior year was $36,796, and she had filed a personal bankruptcy petition only a few months before the theft. Broxton had occasional employment as a day laborer with a temporary employment agency in Valdosta and very limited earnings -- his W2 form reflected that he earned only $4,500 for the entire previous year. The third co-defendant, Robert Broxton, is William Broxton's uncle who lived in New Jersey with his girlfriend, Brenda Lynch. Robert Broxton traveled from New Jersey to Valdosta shortly before the postal theft occurred.

In the early morning of September 4th, the day after the late-night theft, Robert Broxton called Brenda Lynch and said that he, William Broxton, and Turner were driving that morning from Valdosta to Lynch's house in New Jersey. Lynch testified that Turner and the Broxtons arrived at her house early on Sunday morning, after a drive of about 16 hours, accompanied by Turner's infant (William Broxton's child). Turner stayed for only a brief time, leaving the same morning to drive back to Valdosta in order to be able to report to work the following night.

On the day after arriving in New Jersey, William Broxton went to a car dealership in Orange, New Jersey, accompanied by Brenda Lynch, and made the

7

first of a number of large cash purchases, paying $18,500 in cash for a Ford Explorer. According to the salesman, Richard Adetule, Broxton obtained the cash from a plastic garbage bag, and gave a $100 cash tip to Adetule. Broxton titled the car in Brenda Lynch's name.

Sometime in the next week, Broxton returned to Valdosta. On September 16, 2004, according to his probation officer, Jennifer Wallace, Broxton used a money order to pay a $645 court-ordered fine. On the same day, Broxton went to Zales Jewelers, where he was assisted by Joshua Dillow who testified that Broxton paid cash for a diamond engagement ring costing $3,000, and that he was accompanied by a black woman whom Dillow could not positively identify as Turner. The government also presented evidence of Broxton's numerous cash purchases in the weeks following the theft, including the purchase of a speaker box, an amplifier, a car CD player for $500, and a new window on the Ford Explorer for $250.

On September 22nd, while driving the Ford Explorer, Broxton, whose driver's license had been revoked, was stopped for an improperly displayed tag. Broxton told the officer, Michael Weldon of the Lowndes County Sheriff's Office, that his wife was following behind him. In response to Officer Weldon's questioning about where he and his wife were employed, Broxton claimed that his wife worked for the military. Thereafter, Broxton was arrested for driving with a

8

suspended license. Turner arrived at the scene and told Officer Weldon that she wanted to take possession of the Ford Explorer. The officer responded that Turner could not take the vehicle because she was not the registered owner and there was no proof of insurance on the vehicle. Turner then falsely said that she was the owner, that her name was "Brenda Lynch," and that she lived in the Penny Place area of Valdosta. In fact, Turner lived in another area of town, on Wroxham Circle.

Some three days later, Broxton, accompanied by defendant Turner, went to a used-car dealership in Valdosta, where Broxton paid slightly more than $13,000 in cash for the purchase of a Chevrolet Suburban.

On September 30th, U.S. Postal Inspectors Marla McLendon, James Hayson, and Michael Iorio executed a search warrant at Turner's residence. Turner initially asked the officers to come back later, stating that she was getting married that day. Turner eventually allowed the inspectors to enter. The inspectors observed and confiscated a backpack that was partially wedged behind the master-bedroom dresser. The backpack contained some $9,780 in cash. One of the bills was stamped "USPS" in red ink, while seven other bills had partial stamps or the same red ink on them -- this ink and these markings were consistent with the round date-stamps often applied by postal employees when the employees stamp the

9

money-strap that secures the currency in a remittance. Also in the house, the investigators found a Zales receipt for the purchase of the diamond engagement ring.

The investigators also confiscated Turner's check registry, which Inspector McLendon testified reflected that Turner "consistently kept negative balances" in her bank account until September 7, 2004, when there was a positive balance. In the last entry, dated September 24th, the balance was $2,200. In the course of their search of Turner's home, the inspectors installed a tracking device on Turner's car.

A few hours after the search, a little after midnight, according to the tracking device, Turner drove from Valdosta to Maryland. She returned three days later, on October 3rd, driving on I-10 through Jennings, Florida. She arrived at her house at 10:00 p.m., was at the house for about 25 minutes, and then got back in her car and returned to Jennings, where she spent the night at a motel. The next day, October 4th, she drove to Lake City, Florida, which is about one hour south of Valdosta, and rented a storage unit. She used an alias, Tranese Townsend -- a name that nobody with whom she worked had ever heard her use -- a Maryland driver's license, and an inaccurate address and telephone number in Maryland. Information from the tracking device on her vehicle also reflected that Turner returned to the Lake City storage unit several times between October 4th and October 15th,

including on the day that she was served with a subpoena from a grand jury. However, a search at the end of that time-frame revealed that the storage locker was empty except for a few clothes and household items.

The government also presented the testimony of Ronald Beckstrom, an attorney who had represented Broxton in a prior matter. Beckstrom told the jury that on October 6th, Turner came to his office and made a cash payment for the fees Broxton still owed, which amounted to $2,975.

While Broxton was in local custody, he and Turner had a number of telephone conversations that were recorded by the authorities. The recordings were played for the jury during the government's case. In one telephone conversation, on October 4th, Broxton asked Turner when she had the opportunity to use a pay-phone, to call "his friends" and tell them to "disappear" with him. In another conversation, on October 13th, Broxton assured Turner that he had all the faith in the world in her and that his faith was the reason that he was "here where I'm at," and "doing what I'm doing." Turner responded that she would "never say anything against" Broxton.

A couple of days later, in still another recorded conversation, Broxton and Turner talked about getting married and discussed how that would protect them from being forced to testify or make statements against one another. Finally, in yet

11

another jailhouse tape-recording, Broxton told Turner that he would have murdered the federal agents if he had been present when the search warrant was executed at Turner's residence. He said "I'dve openfired," and "now, can you imagine me being home when they came there?" Turner responded: "Um, I'm glad you wasn't." Broxton indicated that "somebody had hurt," and Turner laughed and responded "uh huh, and we'd be running out the backdoor." Broxton then said, "shit, would have damn sure got ugly," and Turner responded, "I know." During their final recorded telephone conversation, Turner told Broxton that they could have moved and left the country if Broxton had engaged in the scenario involving the murder of federal agents. Turner said, "We'd have been on the run living in Canada." She also offered that she could change her name.

The Bruton errors occurred during the testimony of two of the government's witnesses: Robert Parrish, who had been William Broxton's cellmate in jail,[3] and

---

[3]The relevant portion of Parrish's testimony is this:

Q. What did he tell you about any individuals inside the post office?

A. You know, that his wife worked there, or his old lady or whatever. You know, like, his kid's mama worked there, and, like, he say that when he did the burglary, you know, like, he had caught a dude that was working on the back, you know, sleeping, and that's when the dude took off, and that's when he did what he did, and he left because she get off the next morning at seven.

Q. Did he say anything about his wife, girlfriend's role in the burglary? Did she have any role in it or do anything?

A. Yeah, 'cause she worked there, you know, she worked that night.

12

Lakisha Thorp, who had used drugs on several occasions with Broxton.[4]  This

Q. Did she do anything to help him, give him any information?

A. Yeah, let him know where it was.

Q. Where what was?

A. Where the money was.

. . . .

Q. Do you know who laid out – did he tell you who laid out the plan?

A. Said his wife did.

Vol. III, p. 69-70.

[4]The relevant portion of Thorp's testimony follows:

Q. While you were there at the Guest House Inn in Valdosta, did Black, Mr. Broxton, make some statements to you about a theft or a burglary of a post office?

A. Yes, sir.

Q. What did he state?

A. I don't have a recollection of exact words, but something along the lines of – that him and his uncle and somebody else had robbed the post office.

Q. Had what?

A. Had robbed the post office that his wife worked at.

Q. Did he state anything about what his wife's involvement was?

A. That she had given them the information on how to go about it.

Q. Who was the other individual? The wife, Ms. Turner, and I'm sorry, you mentioned another individual, an uncle?

A. Yes. Yes, sir.

Q. Do you know the uncle's name?

13

much is clear from the testimony.  Both testified about Broxton's statements to them, wherein Broxton admitted committing the charged crimes. The <u>Bruton</u> violations occurred when the witnesses both stated, after extensive encouragement through leading questions from the Assistant U.S. Attorney, that Turner was the organizer of the scheme.

At no point during the prosecutor's questions, which were framed in such a manner as to squarely elicit testimony that violated <u>Bruton</u>, or during the extensive <u>Bruton</u>-offending testimony of either witness, did defense counsel object or request a curative instruction.  Rather, the only defense argument concerning the two witnesses' testimony came at the conclusion of both direct examinations, when Broxton's attorney moved for "<u>Jencks</u> materials"[5] and the government responded that all of the <u>Jencks</u> material had been provided.

The parties agree that at some point after court had recessed for the day, the district judge told the prosecutor that he thought there was a <u>Bruton</u> problem and

---

A. No, sir.

Q. Did he state or tell you who was the organizer?

A. His wife, because she was the one who worked there.

Vol. III, p. 189-90.

    [5]  See <u>Jencks v. United States</u>, 353 U.S. 657 (1957); 18 U.S.C. § 3500 (requiring government to disclose to criminal defendant any prior statement made by government witness that relates to the witness's trial testimony).

14

directed the prosecutor to tell defense counsel about the matter. The next day, the district court began by asking for argument on the Bruton issue. The government admitted the Bruton violations, but stated its belief that the trial could proceed with a curative instruction. Turner's counsel subsequently moved for a severance, which the district court took under advisement, indicating that it wanted to hear all of the evidence first.

At the end of the government's case, Turner's counsel argued that there was no evidence of an agreement between Turner and the Broxtons, other than the Bruton-violative testimony of Parrish and Thorp. Counsel again moved for a severance and moved for a judgment of acquittal ("JOA"). The government responded that Turner's failure to raise a timely objection, contemporaneous with the Bruton-offending testimony, meant that any error was subject to harmless-error analysis. The district court denied the motions for severance and for JOA.

In his defense, Broxton offered the testimony of his mother and three sisters, all of whom claimed to have made various cash gifts to Broxton around the time of the robbery. The cash gifts exceeded $20,000, but the witnesses were unable to explain the source of the money since they were either retired (the mother) or unemployed (the sisters). One of Broxton's sisters also claimed to have seen him receive about $6,000 in cash for a construction job he worked on in New Jersey.

15

In her own defense, Turner presented the testimony of two co-workers who said that they were familiar with Turner's reputation for honesty and veracity, and that Turner had been honest with them.

Turner also testified extensively in her own defense. According to Turner, on the day of the theft, she was home in the afternoon and evening until 10:00 p.m. She said that Broxton got home around 7:00 p.m. and watched the children while she took a short nap prior to leaving for work a little after 10:00 p.m. She claimed that Broxton was home the whole time before she left for work. When she finished working her shift at 7:00 a.m., Broxton unexpectedly asked her to accompany him and his uncle on a drive from Florida to New Jersey. She said she had not planned to go to New Jersey. They left shortly after Turner finished her shift.

Turner said that on the way to New Jersey, she dropped three of her children off with her mother in Maryland. She then brought the Broxtons to New Jersey, dropped them off, and went directly back to Maryland. After a nap in Maryland, she promptly returned home with her mother and all of her children so that she could return to her job in Valdosta. On the evening of Monday, September 6th, Turner reported for her regular shift.

On cross-examination, when asked about the jailhouse recordings of conversations she had with Broxton, Turner first claimed that she could not

16

remember the phone calls at all. Then, she suggested, she was not sure it was her voice on the tapes and offered that her voice sounds like her mother's, her sister's, and her daughter's voices. When asked about her wedding, which she had told the postal inspectors was to take place on the day of the search of her house, she said she could not remember when Broxton gave her the engagement ring. During redirect examination, her attorney asked a series of questions meant to rehabilitate Turner, in response to which she recanted her claim that she could not recognize her own voice on the tapes and suggested that although she could not remember the Zales engagement ring, she had received a different engagement ring from Broxton about one year before the robbery.

In its charge to the jury, the district court included the following limiting instruction concerning Parrish's and Thorp's Bruton-violative testimony:

> When the Government offers testimony or evidence that a Defendant made a statement or admission to someone, after being arrested or detained, the jury should consider the evidence concerning such a statement with caution and great care.
>
> It is for you to decide (1) whether a Defendant made any statement and (2) if so, how much weight to give to it. In making these decisions you should consider all of the evidence about the statement, including the circumstances under which a Defendant may have made it.
>
> Of course, any such statement should not be considered in any way whatever as evidence with respect to any other Defendant on trial.

17

Two witnesses, Robert Parrish and Lakeisha Thorp, have testified regarding out of court statements by Defendant William Broxton, and in determining the guilt or innocence of Defendant Turner you are not to consider any of the alleged statements of Defendant Broxton.

The jury found Turner guilty on all charged counts except Count Seven. Turner again moved for a new trial based on the Bruton errors, and the district court reserved ruling.

Turner then proceeded to sentencing. The presentence investigation report ("PSI") first grouped the offenses of conviction (putting Counts One, Two, and Three together based on their relatedness), pursuant to U.S.S.G. § 3D1.2, and calculated offense levels for each group.[6] Pursuant to U.S.S.G. § 3D1.3(a), the PSI used an adjusted offense level 24, which yielded a Sentencing Guidelines advisory range of 51 to 63 months imprisonment. Turner faced five-year maximum terms

---

[6]The PSI used the following three groups and corresponding offense levels:

(1) a 24 for Counts One, Two, and Three based on a base offense level of 6, pursuant to §§ 2X1.1(a) and 2B1.1; a 12-level upward adjustment for the amount of loss, § 2B1.1(b)(1)(G); a 2-level upward adjustment for an offense involving the conscious or reckless risk of death or serious bodily injury, § 2B1.1(b)(12)(A); a 2-level upward adjustment for abuse of a position of public trust, § 3B1.3; and a 2-level upward adjustment for obstruction of justice, § 3C1.1;

(2) a 14 for Count Six, pursuant to § 2J1.2; and

(3) a 23 for Count Eight based on a base offense level of 20, pursuant to § 2S1.1; a 1-level upward adjustment for violation of 18 U.S.C. § 1957, § 2S1.1(b)(2)(A); and a 2-level upward adjustment for obstruction of justice, § 3C1.1.

18

on Counts One and Two and ten-year maximum terms on Counts Three, Six, and Eight.

The government filed a written objection to the PSI's failure to assess an upward adjustment for Turner's aggravating role in the offense and argued, based on the fact that Turner was the "insider," "mastermind," and "brains" of the theft, that the offense level should be adjusted, pursuant to U.S.S.G. § 3B1.1. The government also argued for an upward departure based on Turner's and Broxton's telephone conversations when they discussed killing federal agents, assuming false identities, and fleeing the country.

At the sentencing hearing, Turner's attorney noted that his motion for a new trial based on the Bruton errors was still pending. The district court responded that it would enter a written order later. Turner sought a downward variance based on Turner's lack of a prior criminal history, her gainful employment during her adult life, her honorable service in the U.S. military, and the fact that she has four children. As for the jailhouse recordings, defense counsel suggested that the conversation about killing the federal agents executing the warrant at Turner's house "was of a joking nature" and "was all in jest."

19

The district court expressed its belief that based on the evidence it heard at trial, and in light of the jury verdict, Turner's crimes presented "a very serious matter." The court then said:

> I recognize that the Supreme Court ruling in [Booker] sets forth that the district courts, while not being bound to apply the sentencing guidelines, must consult [them] and take them into account when sentencing. In imposing sentence today, I have taken the guidelines under advisement and determined the advisory sentencing range is 51 to 63 months . . .. I find the advisory range to be inadequate . . . .

Turner was sentenced to a 240-month term of imprisonment consisting of: concurrent 60-month sentences on Counts One and Two, overlapping concurrent 120-month sentences on Counts Three and Six, and a 120-month consecutive sentence on Count Eight.[7]

In imposing sentence, the district court observed:

> The sentence as imposed is an appropriate sentence in this case, and it's my judgment that such sentence complies with the factors that are to be considered as set forth in 18 U.S.C. § 3553(a). In imposing sentence, the Court has specifically considered the nature and circumstances of the offenses and your history and characteristics.
>
> The Court cannot dismiss trial testimony and evidence, including the recorded conversation wherein the defendants discussed the willingness to murder federal agents during the execution of a search warrant at your residence. The Court believes the defendants

---

[7] Broxton received a 300-month term consisting of: concurrent 60-month sentences for Counts One and Two; concurrent 120-month terms for Counts Three, Four, and Five, consecutive to the sentences on Counts One and Two; concurrent 120-month sentences on Counts Seven and Eight, consecutive to the sentences on Counts Three, Four, and Five; and 120-month terms on Counts Nine and Ten, concurrent with the other sentences.

fully capable of such actions should the opportunity have presented itself, and the defendants had the means of completing such acts as evidenced by the fact Defendant Broxton possessed a stolen handgun and Defendant Turner's reference to her handgun in the recorded conversations.

The Court also notes the defendant's lack of remorse for such actions as evidenced by [her] remarks that the two defendants would flee the United States and assume false identities.

The Court believes that the sentence imposed takes into account the seriousness of the offenses, promotes respect for the law, and provides just punishment in this case. The Court is also of the opinion that the sentence provides adequate deterrence from further criminal conduct and protects the public from further crimes that may be perpetrated by this defendant.

After the court announced its sentence, the government asked for clarification concerning its request for a leader-organizer upward adjustment: "for purposes of having a clear record, my question to the Court is did the Court grant the government's motion for two to four points for leader-organizer?" The district court responded "No."

One week later, the district court entered a written order denying the motion for a new trial and noting that, although "[t]here is no question that the statements of defendant Broxton to which Mr. Parrish and Ms. Thorp testified violated Turner's rights under Bruton," the errors were undoubtedly harmless given the substantial circumstantial evidence linking Turner to the conspiracy. This appeal followed.

21

II.

The parties disagree on the standard of review applicable to Turner's

Bruton claim. The government urges us to review the issue for plain error based

on Turner's failure to contemporaneously object, while Turner maintains she is

entitled to harmless-error review based on her non-contemporaneous arguments,

which she presented to the district court on the day following the admission of the

disputed testimony. It is hardly surprising that the parties disagree on the

controlling standard of review inasmuch as the standards differ sharply.

Normally, we would review issues concerning a district court's evidentiary

rulings, such as the Bruton claim here, for abuse of discretion, United States v.

Jiminez, 224 F.3d 1243, 1249 (11th Cir. 2000), and would subject improperly

admitted Bruton evidence to review for harmlessness beyond a reasonable doubt,

meaning that we would ask whether "the properly admitted evidence of guilt [was]

so overwhelming, and the prejudicial effect of the co-defendant's statement so

insignificant, that beyond any reasonable doubt the improper use of the statement

was harmless." United States v. Doherty, 233 F.3d 1275, 1282 (11th Cir. 2000).

However, it is well-settled that where, as here, a defendant fails to preserve

an evidentiary ruling by contemporaneously objecting, our review is only for plain

error. See, e.g., United States v. Siddiqui, 235 F.3d 1318, 1322 (11th Cir. 2000);

22

United States v. Calderon, 127 F.3d 1314, 1334 (11th Cir. 1997) ("As an evidentiary matter, a contemporaneous objection was required to allow the district court the opportunity to correct any error that may have existed."); United States v. Simon, 964 F.2d 1082, 1085 (11th Cir. 1992) ("This court generally does not review evidentiary rulings except on the grounds asserted in a contemporaneous objection."); United States v. Perez-Garcia, 904 F.2d 1534, 1540 (11th Cir. 1990) ("The lack of a contemporaneous hearsay objection requires this court to review the admission of the testimony under the standard of plain error."); see also United States v. Jobe, 101 F.3d 1046, 1068 (5th Cir. 1996) (reviewing Bruton claim only for plain error where defendant failed to object to offending testimony and where other evidence of guilt was sufficient to support conviction); United States v. Cartwright, 6 F.3d 294, 300 (5th Cir. 1993) (holding that no plain Bruton error occurred when other evidence of guilt was overwhelming).

Plain-error review differs from harmless-error review in both purpose and scope. See United States v. Simmons, 961 F.2d 183, 185 n.1 (11th Cir. 1992) (per curiam). Most notably, unlike harmless-error review, plain-error review is intended to enforce the requirement that parties lodge timely objections to errors at trial so as to provide the district court with an opportunity to avoid or correct any error, and thus avoid the costs of reversal and a retrial. Id. (citing United States v.

23

Sorondo, 845 F.2d 945, 949 (11th Cir. 1988)). "Consequently, proof of a plain error involves not only a showing of harm, but also proof that the error was so conspicuous that the 'judge and prosecutor were derelict in countenancing it.'" Id. (quoting United States v. Bonavia, 927 F.2d 565, 570 (11th Cir. 1991)). "An error that is not harmless, then, is not necessarily a plain error." Id. In addition to the differences in purpose served by the plain-error and harmless-error standards, the standards also differ in application in two significant ways. United States v. Monroe, 353 F.3d 1346, 1352 (11th Cir. 2003). First, under plain-error review, the defendant bears the burden of persuasion to show prejudice or an effect on substantial rights, whereas under harmless-error review, the government has the burden of establishing harmlessness beyond a reasonable doubt. Id. Second, "plain-error review has the additional requirement that an appellate court then must decide whether to exercise its discretion to notice a forfeited error." Id. We will exercise our discretion to correct only those errors that "seriously affect[] the fairness, integrity or public reputation of judicial proceedings." United States v. Vonn, 535 U.S. 55, 63 (2002) (quoting United States v. Olano, 507 U.S. 725, 736 (1993)).

We can discern no reason why this Circuit's well-settled requirement of a contemporaneous objection to preserve an evidentiary ruling for appellate review

24

should not apply here. "[O]ne of the fundamental purposes of the contemporaneous objection rule is to protect judicial resources, in particular by ensuring that the trial courts will have an opportunity to avoid errors that might otherwise necessitate time-consuming retrial." United States v. David, 83 F.3d 638, 644-45 (4th Cir. 1996). Another purpose of the contemporaneous objection rule is to prevent counsel from "'sandbagging' the courts by withholding a valid objection from the trial court in order to obtain a new trial when the error is recognized on appeal." Id. at 645. Neither purpose would be served were we to accept Turner's suggestion that her non-contemporaneous arguments concerning the Bruton-violative testimony sufficed to preserve the issue and entitle her to harmless-error review. Turner had ample opportunity to lodge a Bruton objection during the two direct examinations at issue but did not. An objection was made by the defense only the next day, and then only after the district court sua sponte raised the matter. By failing to interpose a timely objection during the direct examination of either witness, the defense provided the district judge with no timely opportunity to avoid serious error that might otherwise have necessitated a time-consuming retrial.

To demonstrate plain error, the defendant must show that there is "(1) error, (2) that is plain and (3) that affects substantial rights. If all three conditions are

25

met, an appellate court may then exercise its discretion to notice a forfeited error, but only if (4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." Monroe, 353 F.3d at 1349 (internal quotations and citations omitted). "Where errors could have cut either way and uncertainty exists, the burden is the decisive factor in the third prong of the plain error test . . . ." United States v. Rodriguez, 398 F.3d 1291, 1300 (11th Cir.), cert. denied, 545 U.S. 1127 (2005). "Errors do affect a substantial right of a party if they have a 'substantial influence' on the outcome of a case or leave 'grave doubt' as to whether they affected the outcome of a case." United States v. Frazier, 387 F.3d 1244, 1268 n.20 (11th Cir. 2004) (en banc), cert. denied, 544 U.S. 1063 (2005).

As for Turner's sentencing challenge, we review the district court's application of the Sentencing Guidelines de novo and its underlying factual findings for clear error. United States v. Pope, 461 F.3d 1331, 1333 (11th Cir. 2006). After the Supreme Court's decision in United States v. Booker, 543 U.S. 220 (2005), we review the ultimate sentence imposed for reasonableness. Pope, 461 F.3d at 1333.

## III.

First, Turner argues that the Bruton-offending testimony violated her right to a fair trial. In Bruton, two defendants were accused of participating in the same

26

crime and tried jointly. One of the defendants had confessed, naming and incriminating the other defendant. The trial court admitted the confession into evidence with a limiting instruction to the jury. The Supreme Court held that despite a limiting instruction, the admission of a "powerfully incriminating extrajudicial statement" of a non-testifying co-defendant violates a defendant's Sixth Amendment right to confront and cross-examine an adverse witnesse. 391 U.S. at 135-36. A statement is "powerfully incriminating" under Bruton if it directly implicates the defendant. See United States v. Beale, 921 F.2d 1412, 1425 (11th Cir. 1991) (citing United States v. Satterfield, 743 F.2d 827, 849 (11th Cir. 1984)). Moreover, the Supreme Court made it clear that a limiting instruction by the district judge will not eliminate the prejudicial effect of the introduction of a non-testifying co-defendant's inculpatory statement. While the Supreme Court, since its 1968 landmark decision in Bruton, has had occasion to rule that the confession of a non-testifying co-defendant admitted at a joint trial that had been redacted to omit any reference to the defendant did not violate Bruton, see Richardson v. Marsh, 481 U.S. 200, 208-09 (1987); see also Gray v. Maryland, 523 U.S. 185 (1998), it has never receded from the basic principle enunciated in Bruton "that a defendant is deprived of his Sixth Amendment right of confrontation when the facially incriminating confession of a nontestifying

27

codefendant is introduced at their joint trial, even if the jury is instructed to consider the confession only against the codefendant." Richardson, 481 U.S. at 207.

Quite obviously, both Parrish's testimony and Thorp's testimony violated Bruton and should have been excluded. During Parrish's testimony, the prosecutor first posed the following question, which, although arguably innocuous for Bruton purposes, contemplated answers that violated Bruton in light of the questions that followed: "What did he [Broxton] tell you about any individuals inside the post office?" Parrish responded, "that his wife worked there, . . . and, like, he say that when he did the burglary, you know, like, he had caught a dude that was working on the back, you know, sleeping, and that's when the dude took off, and that's when he did what he did, and he left because she get off the next morning at seven." Apparently not satisfied with this response, the prosecutor went on to ask: "Did he say anything about his wife, girlfriend's role in the burglary? Did she have any role in it or do anything?" and "Did she do anything to help him, give him any information?" This line of questioning invited testimony that undeniably violated Bruton. Parrish responded that Turner worked at the post office on the night of the robbery and "let [Broxton] know where [the money] was." Despite the Bruton violations, defense counsel failed to object at any point.

28

But the prosecutor continued, eliciting still further <u>Bruton</u>-offending testimony: "Do you know who laid out – did he tell you who laid out the plan?" Parrish responded, "Said his wife did."

During Thorp's testimony, the prosecutor posed similar questions and elicited further testimony that violated <u>Bruton</u>; again, Turner's attorney failed to object. As with Parrish's testimony, Thorp's testimony initially did not violate <u>Bruton</u>, because it did not directly implicate Turner. Thorp stated, "I don't have a recollection of exact words, but something along the lines of – that him and his uncle and somebody else had robbed the post office." The prosecutor then asked a question that could yield only <u>Bruton</u>-offending testimony: "Did he [Broxton] state anything about what his wife's involvement was?" Thorp responded, "That she had given them the information on how to go about it." And then, to make sure that Turner's role was clear, the prosecutor asked the following question, "Did he state or tell you who was the organizer?" to which Thorp replied, "His wife, because she was the one who worked there."

Understandably, given the obvious nature of the <u>Bruton</u> errors, both sides agree on appeal that prongs one and two of the plain-error test have been met. The line of questioning and answers unequivocally invited and constituted

29

Bruton violations.  And we readily conclude that the errors were plain, given the well-settled nature of the law.

Turning to the third prong of the plain-error analysis, as we must, we consider the effect, if any, of the error on substantial rights.  It remains Turner's burden to show that the Bruton error affected the outcome of her trial -- that is, that the Bruton error made a difference in the jury's verdict.  Rodriguez, 398 F.3d at 1300.  On the record before us, we cannot find that she has met her heavy burden.

The simple fact is that, independent of the challenged testimony, the government presented overwhelming evidence in support of Turner's convictions.  From the start, it was evident that the theft of this Post Office was an "inside job."  Turner, as a longtime postal employee in Valdosta, had access to all of the required inside information, including the date on which a significant amount of money and valuables would be in the registry, when the post office would be guarded by only one employee (an elderly employee with poor eyesight), and the combination to the interior door.

In addition to her inside knowledge, her conduct in the days immediately following the robbery strongly supports the conclusion that she was a knowing participant in the scheme.  According to her co-workers, during her late-night shift that started just over an hour after the robbery, Turner was "nervous" and "jumpy"

30

and even asked questions about the postal investigators' success rate in such cases and the inspectors' ability to access suspects' financial records.

In the early morning on the day after the robbery, Turner embarked on a 36-hour road trip, which she claimed was unexpected, traveling round-trip from Georgia to New Jersey via Maryland with only two very brief stops. Other evidence supporting the jury's guilty verdict includes the facts that Turner's annual gross income was $36,796, she had just declared bankruptcy a few months before the theft, and Turner's check registry "consistently kept negative balances" until September 7th, just days after the theft.

In addition, the jury also heard about Broxton's and Turner's numerous and large cash expenditures soon after the robbery. Notably, Turner accompanied Broxton during the all-cash purchase of the $13,000 Suburban on September 25th. Although she was not at the New Jersey dealership on September 5th, when Broxton bought the Ford Explorer for $18,500 in cash, the jury easily could have inferred that she knew at least that the vehicle was improperly titled based on her false statements during the September 22nd traffic stop of Broxton, when Turner said that her name was "Brenda Lynch" and that she was the owner of the Ford Explorer.

31

Moreover, on October 6th, it was Turner who went to Broxton's former attorney's office and made an all-cash payment in the amount of $2,975 for outstanding fees. While it is not clear if Turner was at the Zales store on September 16th, when Broxton purchased an engagement ring for Turner with cash, it is quite apparent that she knew about the purchase itself because, when the postal inspectors came to search her house, she said that she was getting married and, during her own testimony, recanted her claim that she could not remember receiving the Zales engagement ring, instead suggesting that she had received a different ring from Broxton.

The government also presented substantial evidence obtained in the course of the postal inspectors' search of Turner's house and subsequent investigation of Turner, during which investigators installed a tracking device on her vehicle. Perhaps most significant, the investigators discovered a backpack, in the master bedroom Turner shared with Broxton, only partially wedged between a mirror and the wall and apparently visible upon entering the room. The backpack contained $9,780 in cash bearing notable ink and marks consistent with U.S. Postal Service stamps. Moreover, the tracking device placed on Turner's vehicle reflected Turner's numerous trips to the Lake City storage unit between October 4th and

October 15th, including after her house was searched and on the afternoon that she was served with a grand jury subpoena.

The government also played several jailhouse recordings of Turner's and Broxton's telephone calls, in which they discussed "never saying anything" against each other, opening fire on federal agents who had searched Turner's house, and fleeing the country and assuming new identities.

In addition, Turner's own trial testimony, which was largely incredible, internally inconsistent, and flatly contradicted by other evidence presented throughout the trial, may properly be considered by the jury and this Court as substantive evidence. Indeed, in his order denying Turner's motion for a new trial, the district judge, who had the opportunity to hear Turner's testimony and observe her demeanor, described Turner's testimony as "evasive, defensive, often contradictory, and completely lacking in credibility."

Although Turner now suggests that, without the Bruton-offending testimony, she could have argued that she unwittingly may have revealed the necessary inside information to Broxton, at trial her theory of defense was that neither she nor Broxton were involved. Indeed, during her testimony, Turner maintained that on the night of the crimes, Broxton was home from 7:00 p.m. until when she left the house a little after 10:00 p.m. Turner's testimony providing an alibi for Broxton

was completely inconsistent with the government's ample evidence showing that he robbed the post office.

Turner's testimony also was internally inconsistent on numerous points. Thus, for example, when asked about the jailhouse recordings of her telephone conversations with Broxton, Turner first claimed that she did not remember having the conversations. She then suggested that she could not recognize her own voice, since it sounded like her mother's, daughter's, and sister's voices. Finally, during redirect examination, Turner proceeded to change this testimony concerning the jailhouse recordings. She likewise recanted her testimony that she could not remember when Broxton gave her the engagement ring.

"[W]hen a defendant chooses to testify, [s]he runs the risk that if disbelieved the jury might conclude the opposite of [her] testimony is true." United States v. Brown, 53 F.3d 312, 314 (11th Cir. 1995) (internal quotation marks and citation omitted). Like the defendant in Brown, Turner testified that she had no knowledge of the illegal conspiracy and also claimed she did not notice anything suspicious during her encounters with the other conspirators. As we observed in Brown, "the jury, hearing [the defendant's] words and seeing [her] demeanor, was entitled to

34

disbelieve [her] testimony and, in fact, to believe the opposite of what [she] said."

Id.[8]

Here, there was overwhelming evidence, apart from the <u>Bruton</u>-offending testimony, of Turner's involvement in the conspiracy. Moreover, she put forth no remotely plausible theory of defense, offering only two witnesses who testified about her reputation for honesty in the community, and her own testimony, which was heavily impeached. On this record, Turner has not shown that the outcome would have been different but for the <u>Bruton</u> error, and thus that her substantial rights were affected. In short, she has not satisfied her burden on the third prong of the plain-error test, and therefore, she has not established plain error.

IV.

We, likewise, are unpersuaded by Turner's challenge to her 240-month sentence. Turner claims that the district court relied on the <u>Bruton</u>-violative testimony concerning her purported leadership role to impose an upward variance.

---

[8] The cases Turner cites in support of her <u>Bruton</u> claim are inapposite. <u>See, e.g.</u>, <u>United States v. Doherty</u>, 233 F.3d 1275, 1282 (11th Cir. 2000) (where circumstantial evidence against defendants was limited, <u>Bruton</u> violation was only direct evidence of defendants' involvement, <u>and</u> defendants had a plausible theory of defense, <u>Bruton</u> testimony was not harmless); <u>United States v. Ramirez-Perez</u>, 166 F.3d 1106, 1108-11 (11th Cir. 1999) (where the only evidence against defendant was his presence in a car at the crime scene and the fact that he had a gun under his seat, a federal agent's testimony that a co-defendant told the defendant to bring the gun "for protection" was the only evidence connecting the defendant to the conspiracy and thus violated <u>Bruton</u> and was not harmless).

35

Turner also asserts that the sentence was unreasonable because the jailhouse tape-recordings do not, alone, support the sentence.

From our review of the entire record, particularly the PSI and the transcript of the sentencing hearing, it is clear that in imposing sentence, the district court did not rely on Turner's purported leadership role in the offenses. First, the PSI made no mention of Turner's leadership role. Moreover, at the sentencing hearing, the government directly asked whether the court had granted "the government's motion for two to four points for leader-organizer," to which the district court responded "No." There is no indication that the district court imposed the upward variance based on the Bruton-offending testimony or on Turner's leadership role in the offense.

As for the reasonableness of the ultimate sentence imposed, our review is deferential, requiring us to "evaluate whether the sentence imposed by the district court fails to achieve the purposes of sentencing as stated in [18 U.S.C. §] 3553(a)." United States v. Talley, 431 F.3d 784, 788 (11th Cir. 2005). Turner bears the burden of establishing that her sentence is unreasonable in light of the record and the § 3553(a) sentencing factors. See id. The § 3553(a) factors include: the history and characteristics of the defendant; the available sentences; the applicable Guideline range and policy statements; and the nature and

circumstances of the offense.  See 18 U.S.C. § 3553(a).  The district court should also consider the need for the sentence (1) to reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense; (2) to afford adequate deterrence to criminal conduct; (3) to protect the public from further crimes of the defendant; and (4) to provide the defendant with needed correctional treatment.  See id. § 3553(a)(2).

We have established a two-part process for district courts to use in fashioning sentences.  Talley, 431 F.3d at 786.  First, the court must consult and correctly determine the advisory range prescribed by the Sentencing Guidelines.  Id.  Second, to determine a reasonable sentence, the court must consider the factors enumerated in 18 U.S.C. § 3553(a).  Id.  However, the court need not state on the record that it has considered each of the § 3553(a) factors.  United States v. Scott, 426 F.3d 1324, 1329 (11th Cir. 2005).  Rather, an acknowledgment by the district judge that he or she has considered the § 3553(a) factors will suffice.  Talley, 431 F.3d at 786.

Here, the district court expressly stated that it had considered the § 3553(a) factors and even listed some of the factors and how they applied to Turner's case. The court heard Turner's mitigating argument in favor of a sentence below the range, including that Turner had no prior criminal history, that she had been

37

gainfully employed during her adult life, that she had honorably served in the U.S. military, and that she was the mother of four children. Despite the mitigating evidence, which concerned Turner and her history, see 18 U.S.C. § 3553(a)(1) (enumerating as a factor, "history and characteristics of the defendant"), the district court expressed its belief that, based on the evidence it heard at trial, and in light of the jury verdict, Turner's crimes presented "a very serious matter," see id. § 3553(a)(2)(A) (enumerating the need for the sentence imposed "to reflect the seriousness of the offense"), and that the advisory range was "inadequate." In reaching this conclusion and imposing a 240-month sentence, the court added that it could not dismiss the telephone calls in which Turner and Broxton discussed the murder of federal agents, and the court noted Turner's lack of remorse, which the court found was evidenced by her statements during the phone calls that she and Broxton could flee the country and assume fake identities. The district court also said that the sentence "promotes respect for the law" and "provides just punishment in this case." Moreover, the court noted that the lengthy sentence was imposed to provide adequate deterrence, see id. § 3553(a)(2)(B), and to protect the public, see id. § 3553(a)(2)(C). Finally, the court's consideration of the PSI and the parties' arguments concerning the sentence to be imposed reflects a consideration of "the kinds of sentences available." See id. § 3553(a)(3).

38

On this record, we cannot say the district court's sentencing rationale was unreasonable under <u>Booker</u>.  The Sentencing Guidelines advisory range was calculated correctly, and the court expressly considered that range and the § 3553(a) factors in imposing sentence.

**AFFIRMED.**