[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 11-13975
Non-Argument Calendar

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JUNE 25, 2012
JOHN LEY
CLERK

D.C. Docket No. 1:11-cr-00034-KD-B-2

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

AMJAD YACOUB SAHAVNEH,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Alabama

_____

(June 25, 2012)

Before HULL, JORDAN and ANDERSON, Circuit Judges.

PER CURIAM:

After a jury trial, Defendant Amjad Sahavneh appeals his conviction for encouraging and inducing an alien, his nephew and co-defendant Mann Haddad, to reside illegally in the United States, in violation of 8 U.S.C. § 1324(a)(1)(A)(iv). On appeal, Sahavneh raises two evidentiary issues. To understand them requires us to outline Sahavneh's own immigration proceedings and then what happened at trial. After full review, we conclude Sahavneh has shown no error in his trial.

## I. BACKGROUND

### A. Defendant Sahavneh's Immigration Proceedings

Defendant Sahavneh was born and raised in Jordan. In 1989, Sahavneh came to the United States on a student visa. In 1992, Sahavneh married a United States citizen, and Sahavneh's wife filed an I-130 visa petition on Sahavneh's behalf. In May 1993, Sahavneh filed an I-485 petition for adjustment of status to lawful permanent resident based on his marriage. After immigration interviews in 1993 and 1995, Sahavneh's petition was initially denied, but was later granted, and, in 1997, his status was adjusted to lawful permanent resident.

In 2001, Sahavneh and his wife divorced. In 2002, Sahavneh applied for naturalization based on his five years as a lawful permanent resident. After his application was granted, Sahavneh became a U.S. citizen in 2003.

### B. Co-Defendant Haddad's Immigration Proceedings

2

At the time of the charged offense, Defendant Sahavneh operated a package store in Alabama. On June 20, 2007, Sahavneh's nephew, Mann Haddad, a Jordanian citizen, entered the United States on a visitor's visa. Two months later, on August 22, 2007, Haddad married Christine Caver, one of the employees at Defendant Sahavneh's package store.

On January 8, 2008, Caver filed an I-130 petition so that Haddad could obtain permanent resident status based on their marriage. Both Caver and Defendant Sahavneh submitted affidavits of financial support for Haddad. After Caver and Haddad attended an August 2008 immigration interview, Haddad was granted conditional resident status, which allowed him to live and work in the United States while his petition was under review by the United States Citizenship and Immigration Service ("USCIS"). However, on October 1, 2010, Haddad was notified that his application was insufficient and he needed to submit additional evidence that his marriage to Caver was legitimate. On October 22, 2010, Haddad advised the USCIS that he wished to withdraw his petition because his wife wanted a divorce. Haddad's request was granted, and his petition for lawful permanent resident status was withdrawn.

## C.    FBI Investigation of Haddad's Marriage to Caver

In September 2010, the Federal Bureau of Investigation began investigating

whether Haddad's marriage to Caver was a sham and approached Caver. Caver admitted that the marriage was a sham and said that Defendant Sahavneh gave her a car and paid some of her bills in exchange for marrying Haddad. Caver agreed to cooperate and recorded conversations with Defendant Sahavneh and Haddad.

Relevant to this appeal, on October 8, 2010, Caver wore a recording device and met with Sahavneh at his package store. During the first twenty minutes, Caver and Sahavneh discussed Caver's personal life, including her recent arrest after an altercation with her ex-husband (not Haddad), her efforts to find a job, her three children and her parents.

After twenty minutes, Caver told Sahavneh that Haddad had filed for divorce, and asked Sahavneh, "[A]re we going to finish our deal with this . . . ?" Haddad responded, "What deal? What deal?" Caver insisted that Haddad owed her money and pointed out that she had not yet signed the divorce papers. Haddad told Caver that "[t]here was no deal" and that he did not care whether she signed the divorce papers. Haddad said he had known Caver for four years, that he had helped Caver "in a personal way" both before and after she married Haddad and that his own "relationship with [Caver] is not about any deal." Sahavneh insisted that what happened between Caver and Haddad was not his business and that he would not give Caver any money.

4

**D. Indictment and Motions in Limine**

A grand jury indicted Defendant Sahavneh and Haddad with one count of conspiring to commit immigration-related marriage fraud, in violation of 18 U.S.C. § 371. In addition, Sahavneh was charged with one count of encouraging and inducing Haddad to reside in the United States, knowing and in reckless disregard of the fact that Haddad's residence was unlawful, in violation of 8 U.S.C. § 1324(a)(1)(A)(iv). Co-defendant Haddad was charged with a substantive count of immigration-related marriage fraud, in violation of 8 U.S.C. § 1325(c).

Prior to trial, the government filed a motion in limine to exclude as inadmissible hearsay Defendant Sahavneh's exculpatory statements in his recorded conversation with Caver. The district court granted in part and denied in part the government's motion. The district court concluded that the first part of the conversation (the first 23 pages of the 63-page transcript), in which Defendant Sahavneh and Caver talked about Caver's personal life, was inadmissible hearsay. However, the remainder of the conversation, in which Caver and Defendant Sahavneh discussed whether Defendant Sahavneh had "a deal" to pay Caver to marry Haddad, was admissible under Federal Rule of Evidence 803(3) to show Sahavneh's then-existing state of mind.

Defendant Sahavneh also filed a motion in limine. Defendant Sahavneh

5

sought to exclude his own immigration records, arguing that they were irrelevant and prejudicial because they gave the false impression that Defendant Sahavneh had also entered into a sham marriage to gain U.S. citizenship. The district court denied Defendant Sahavneh's motion in limine. The district court concluded that Sahavneh's immigration records were admissible to show his knowledge of the U.S. immigration system, which was relevant to the government's theory that Sahavneh coached Haddad and Caver through the immigration process.

**E.    Trial**

At trial, over Sahavneh's objection, the government introduced Sahavneh's immigration records through Agent Kevin Douglas, the lead investigator. Agent Douglas testified that he was familiar with alien files through his 26 years of experience as a border patrol agent. Agent Douglas identified Defendant Sahavneh's alien file, which demonstrated that, like Haddad, Sahavneh originally came to the United States on a temporary visa, married a U.S. citizen, and was then granted permanent resident status based on that marriage.

The government also presented Caver's testimony that Sahavneh offered her $8,000 to $10,000 to marry Haddad; coached Caver and Haddad on how to complete immigration paperwork, prepare for the immigration interview and provide evidence of a bona fide marriage; allowed Caver to live with Haddad in

6

Sahavneh's home for two months before the August 2008 immigration interview; and gave Caver a car and paid some of her bills.

On cross-examination, Caver testified about the recorded conversation she had with Defendant Sahavneh at the package store in October 2010. Sahavneh then introduced a recording of the latter portion of the conversation in which Sahavneh denied the existence of any "deal" and Caver continued to insist Sahavneh owed her money. After the recording was played for the jury, Caver agreed that the first twenty minutes of the conversation—the portion not played for the jury—was a "friendly" and "personal conversation" about "family" and "just shooting the bull."

The jury convicted Haddad of marriage fraud and Sahavneh of alien harboring, but acquitted both defendants of conspiracy to commit marriage fraud. The district court sentenced Defendant Sahavneh to five years' probation, to include 120 days of home confinement and a $2,000 fine. Sahavneh filed this appeal.

## II. DISCUSSION

### A. Immigration Records

On appeal, Defendant Sahavneh argues that the district court abused its discretion by permitting the government to introduce into evidence Sahavneh's

alien file.[1]  However, Sahavneh has not shown abuse of discretion because his immigration records were relevant to show (1) that Sahavneh was familiar with immigration procedures for obtaining lawful permanent residence status based on marriage to a U.S. citizen, knowledge that was essential to his alleged role in the charged conspiracy; and (2) that Sahavneh knew that Haddad's residence in the United States violated the law, an element required for the government to sustain a conviction under 8 U.S.C. § 1324(a)(1)(A)(iv).  See Fed. R. Evid. 401, 402 (2011) (together providing that evidence that has a tendency to make a fact that is "of consequence to the determination of the action" more or less probable is admissible unless it is otherwise excluded by federal law).

Sahavneh also did not demonstrate the degree of prejudice required to justify excluding his immigration records.  Relevant evidence may be excluded if "its probative value is substantially outweighed by a danger of unfair prejudice, confusion of the issues, or misleading the jury."  Fed. R. Evid. 403 (2011); United States v. Dodds, 347 F.3d 893, 897 (11th Cir. 2003) (stating that the remedy in Rule 403 is "extraordinary, . . . should [be] invoke[d] sparingly," and "the balance . . . should be struck in favor of admissibility") (internal quotation marks omitted).

---

[1]We review a district court's evidentiary rulings for a clear abuse of discretion, and will reverse only if the error affected the defendant's substantial rights.  United States v. Dodd, 347 F.3d 893, 897 (11th Cir. 2003).

Sahavneh alleges his immigration records could have misled the jury to believe that Sahavneh's own immigration was the result of "undiscovered and unpunished wrongdoing" and encouraged the jury to convict him for that reason.[2] However, nothing in Sahavneh's immigration records suggested that Sahavneh had committed any wrongdoing, and the government did not argue otherwise to the jury. In fact, during cross-examination, Sahavneh's counsel asked Agent Douglas whether anyone was "implying that there was anything improper about the way [Sahavneh] gained citizenship in the United States of America," and Agent Douglas responded, "No."

Under the circumstances, any danger that the immigration records would unfairly prejudice Sahavneh or mislead the jury was minimal and did not outweigh, much less substantially outweigh, the probative value of the evidence. Further, even if the jury could have drawn an inference that Sahavneh's own citizenship was the result of marriage fraud, it appears the jury did not do so here

---

[2]We find no merit to Sahavneh's argument, made for the first time on appeal, that he was prejudiced by Agent Douglas's testimony that he currently was assigned to the FBI's joint terrorism task force. Specifically, at the beginning of his testimony, Agent Douglas explained that as a border patrol agent, he investigated immigration crimes, such as alien smuggling and illegal entry, and that, as part of the FBI joint terrorism task force, he investigated international terrorists and complaints of national security. Agent Douglas then reviewed the defendants' alien files and explained the immigration process for becoming a lawful permanent resident. Agent Douglas did not mention terrorism again. It is clear from Agent Douglas's testimony as a whole that he investigated Sahavneh for immigration matters and not for terrorism.

given that it acquitted Sahavneh of the conspiracy count.

**B.      Recorded Conversation Between Sahavneh and Caver**

Because Sahavneh did not object contemporaneously to the district court's exclusion of the first twenty minutes of the recorded conversation, our review of that issue is for plain error.  See United States v. Turner, 474 F.3d 1265, 1275 (11th Cir. 2007).[3]

The district court did not commit plain error in excluding the first twenty minutes of the recorded conversation between Sahavneh and Caver as inadmissible hearsay.  Sahavneh does not dispute that the recorded conversation was hearsay evidence, see Fed. R. Evid. 801(c), and hearsay evidence is inadmissible unless it falls within an applicable exception, Fed. R. Evid. 802. Sahavneh does not argue, much less show, that the first twenty minutes of his recorded conversation with Caver fell within any hearsay exception.[4]

Instead, Sahavneh argues that by excising the first portion of the conversation, the district court prevented the jury from seeing the friendly

---

[3]Under the plain error standard, we reverse only if the defendant shows (1) an error; (2) that was plain; (3) that affected his substantial rights; and (4) that seriously affected the fairness of the judicial proceedings.  United States v. Jernigan, 341 F.3d 1273, 1289 (11th Cir. 2003).

[4]The parties do not challenge the district court's ruling that the latter portion of the recorded conversation fell with the then-existing mental state exception to the hearsay rule, see Fed. R. Evid. 803(3), and we do not address this issue on appeal.

relationship between Sahavneh and Caver and left the jury with the mistaken impression that Sahavneh was suspicious and had reason to lie during the conversation.  Sahavneh cites Federal Rule of Evidence 106, which states that "[w]hen a writing or recorded statement or part thereof is introduced by a party, an <u>adverse party</u> may require the introduction at that time of any other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it."  Fed. R. Evid. 106 (2011) (emphasis added); <u>United States v. Range</u>, 94 F.3d 614, 621 (11th Cir. 1996) (extending Rule 106 to conversations).

As Sahavneh concedes, Rule 106 does not apply here because Sahavneh sought to introduce the recorded conversation and thus was not the "adverse party."[5]  Because Sahavneh has not shown that the first portion of the recorded conversation was admissible under Rule 106 or identified any other basis for its admissibility, the district court did not commit error, much less plain error, by excluding it as inadmissible hearsay.

In any event, Sahavneh has not shown that the exclusion of this portion of

---

[5]Because we conclude that the recorded conversation is not admissible under Rule 106, we do not address whether Rule 106 makes admissible parts of a statement that otherwise are inadmissible under the Rules of Evidence.  <u>See</u> <u>United States v. Pendas-Martinez</u>, 845 F.2d 938, 944 & n.10 (11th Cir. 1988) (noting circuit split on the issue).

the conversation affected his substantial rights. Caver testified on cross-examination that the first twenty minutes of the conversation was a friendly personal conversation about family. And, the jury appears to have believed Sahavneh rather than Caver as to whether he had "a deal" with her given that the jury acquitted Sahavneh of the conspiracy charge.

For all these reasons, we affirm Sahavneh's conviction and sentence.

**AFFIRMED.**