[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
February 23, 2007
THOMAS K. KAHN
CLERK

_____

No. 05-14043

_____

D. C. Docket No. 04-60275-CR-JIC

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

ANTHONY JEROME BELL,
a.k.a. Ant,
a.k.a. Amp,
BRUCE HERMITT BELL,

Defendants-Appellants.

_____

Appeals from the United States District Court
for the Southern District of Florida

_____

**(February 23, 2007)**

Before TJOFLAT, HULL and BOWMAN,[*] Circuit Judges.

_____

[*]Honorable Pasco M. Bowman II, United States Circuit Judge for the Eighth Circuit,
sitting by designation.

PER CURIAM:

Following a jury trial, defendant Bruce Bell appeals his convictions and sentences, and defendant Anthony Bell appeals his sentences, for conspiracy to possess with intent to distribute fifty grams or more of crack cocaine, in violation of 21 U.S.C. §§ 846 and 841(a)(1) (Count 1), and possession with intent to distribute fifty grams or more of crack cocaine, in violation of 21 U.S.C. § 841(a)(1) (Count 2). After review and oral argument, we affirm.

## I. BACKGROUND

Because this appeal involves issues related to the searches in this case, we review in detail the events leading up to the two searches.

### A. Search of Buchanan Street Apartment

In June 2004, the Hollywood, Florida Police Department ("HPD") investigated suspicious activity at an apartment located at 6330 Buchanan Street. The owner of the apartment, who had leased the apartment to Bruce Bell, called the HPD's "Tips Hot Line" to advise the police of suspicious activity at the apartment. Based on their subsequent surveillance and information from confidential informants, HPD officers suspected that crack cocaine was being distributed from the Buchanan Street residence. Over the next three months, a confidential informant made several controlled purchases of crack cocaine at the Buchanan Street residence. Officers also learned that Bruce Bell and his cousin, Anthony

2

Bell, were occupants in the Buchanan Street apartment from a police visit to the residence.

On September 14, 2004, HPD obtained a search warrant for the Buchanan Street apartment. In preparation for the raid, officers studied pictures of defendants Anthony and Bruce Bell. The raid did not take place because Anthony and Bruce Bell had departed the Buchanan Street residence, and their car was found outside an apartment at 6205 Tyler Street. On September 17, 2004, after officers observed Anthony Bell entering the Buchanan Street apartment, HPD officers executed the search warrant for the apartment. Officers saw defendants Anthony and Bruce Bell standing near a counter top in the kitchen[1] and observed Bruce Bell grab a substance that looked like crack cocaine. As defendants Anthony and Bruce Bell ran from the kitchen into a bedroom, police saw Bruce Bell throw the substance into a closet.

After arresting defendants Anthony and Bruce Bell, HPD officers confiscated from the Buchanan Street residence: (1) several pieces of crack cocaine from the kitchen counter; (2) additional pieces of crack cocaine from the bedroom closet; (3) two surveillance cameras; (4) an open safe in the kitchen; (5) a small scale located within a kitchen drawer; (6) $2,074 in cash; and (7) mail addressed to Anthony Bell at the Buchanan Street address. Officers found an ecstasy pill and a

---

[1]Codefendant Curtis Sheffield also was in the apartment with a juvenile, Gustavo Fields.

small piece of crack cocaine in Anthony Bell's pockets. In Bruce Bell's pockets, officers found a Florida driver's license in the name of "Brian Elliot King" and several keys. The keys later were found to open the Buchanan Street apartment door, the Tyler Street apartment door, and the safes in the Buchanan Street and Tyler Street apartments.

**B. <u>Miranda</u> warnings**

Following defendant Bruce Bell's arrest on September 17, 2004, HPD Detective Kathy Wilde advised him of his <u>Miranda</u> rights at the police station using a written form. Bruce Bell checked and initialed the form indicating that he understood and waived his <u>Miranda</u> rights, but he initially checked "Yes" as his response to the question, "[i]n regards to this investigation, have you previously asked any Police Officer to allow you to speak to an attorney?" Because this response was contrary to Bruce Bell's earlier statement that he had not asked for an attorney, Detective Wilde asked, "Do you understand what you're checking? You are saying you don't want to talk to us so we are going to leave then." Bruce Bell then crossed out his "Yes" response on the <u>Miranda</u> waiver form, checked the "No" response, and initialed the form next to the "No" answer.

After signing the <u>Miranda</u> waiver form, defendant Bruce Bell confessed that he started selling crack cocaine in August 2003 and described the crack cocaine production process. Bruce Bell admitted that he rented the Buchanan Street

4

apartment as a distribution site for his crack cocaine, and that he subsequently rented the Tyler Street apartment "because there was too much police activity" at Buchanan Street.

### C. Search of Tyler Street Apartment

During this same police interrogation, Detective Wilde and HPD Detective Chris Christianson asked Bruce Bell for consent to search the Tyler Street apartment. The front apartment at 6205 Tyler Street had three doors: one front door, one door in the front of the carport, and one rear door at the back of the building. Bruce Bell indicated that officers should enter the rear door of the front Tyler Street apartment instead of the front door, and Detective Christianson wrote "rear" on the search consent form. Bruce Bell said that officers at his arrest took the key to the rear door of the front Tyler Street apartment from his pocket. Bruce Bell signed the search consent form in the presence of Detective Wilde and Detective Christianson.

Detective Wilde then informed HPD Officer Dennis Wynne, who was at the scene, that he had consent to search the Tyler Street apartment. Officer Wynne opened the rear door to the front apartment at 6205 Tyler Street using one of the keys that had been found in Bruce Bell's pockets, and HPD officers found a safe. HPD officers used another key that had been found in Bruce Bell's pockets to open the safe. Inside the safe, HPD officers found crack cocaine and plastic baggies. A

shoe box next to the safe also contained plastic baggies and a digital scale.

### D. Bruce Bell's Second Arrest

Following defendant Bruce Bell's arrest on September 17, 2004, he was released on bond. The federal government reviewed the case and issued a federal arrest warrant for Bruce Bell on October 13, 2004. On that day, Fort Lauderdale Police Department officers pulled over Bruce Bell's car in a traffic stop and arrested him pursuant to the federal arrest warrant. Officers seized about 7.5 ounces of cocaine powder from the center console and $6,000 in cash from the trunk.

Federal DEA officers, who were present at the arrest, advised Bruce Bell of his Miranda rights, which he waived. Bruce Bell then told DEA Special Agent Jason Gifford that the 7.5 ounces of cocaine powder was his and that the $6,000 in cash was proceeds from drug sales. Bruce Bell admitted that he had delivered two ounces of cocaine to the Tyler Street apartment two days prior to his arrest. Bruce Bell also confessed that he had hired a cousin, Central Williams, to sell crack cocaine from the Tyler Street apartment.

A federal grand jury returned a two-count indictment against Anthony Bell, Bruce Bell, and Curtis Sheffield, charging them with conspiracy to possess with intent to distribute fifty grams or more of crack cocaine, in violation of 21 U.S.C. §§ 846 and 841(a)(1) (Count 1), and possession with intent to distribute fifty grams

6

or more of crack cocaine, in violation of 21 U.S.C. § 841(a)(1) (Count 2).

**E. Suppression Hearing**

Bruce Bell filed a motion to suppress the drugs and drug paraphernalia seized at the Tyler Street apartment. Bruce Bell's main contention was that there were two separate apartments at 6205 Tyler Street: a front apartment and a rear apartment. Bruce Bell argued that he had provided written consent to search the separate rear Tyler Street apartment, which had no connection to the drug operation, but not consent to search the front Tyler Street apartment where the safe and drugs were found using keys from his pockets.

At the suppression hearing, Bruce Bell testified that he only entered the front Tyler Street apartment on the day of his initial arrest to help his cousin Sheffield move furniture. He denied ever having keys to the front Tyler Street apartment and insisted that he had no keys in his possession upon his arrest. According to Bruce Bell, Detective Christianson asked to search the rear Tyler Street apartment, and Bruce Bell responded, "I don't care what you do. It's not my apartment."

HPD Detective Christianson testified about his interrogation of Bruce Bell at the police station following the September 17, 2004 arrest. Bruce Bell advised Detective Christianson that HPD officers had taken his keys to the Tyler Street apartment. After speaking with officers who were outside the Tyler Street apartment, Detective Christianson asked Bruce Bell if his key would open the front

7

door of the Tyler Street apartment, and Bruce Bell replied that the key opened the rear door. Detective Christianson testified that he then wrote "rear" on the search consent form to indicate that the key opened the rear door. Detective Christianson did not know that there were two apartments at 6205 Tyler Street, and no "rear" apartment was discussed with Bruce Bell.

The district court found that Bruce Bell lacked standing based on his own testimony that he did not rent the front apartment. Alternatively, the district court determined that even if standing existed, Bruce Bell "freely and voluntarily" consented to a search of the Tyler Street apartment, no limit was placed on the scope of the consent, and the "Hollywood Police could reasonably interpret the consent to encompass both the rear and front area of 6205 Tyler Street." The court thus denied the motion to suppress.

**F. Trial**

During the jury trial, the government presented testimony from the managers of the Buchanan Street and Tyler Street apartments. Dennis H. Brooks, the owner of the Buchanan Street apartment, identified Bruce Bell as the Buchanan Street apartment tenant. The government showed Brooks the driver's license found on Bruce Bell at his arrest, and Brooks stated that Bruce Bell showed him the same license upon entering into the lease. Lydia Zambrana, the property manager for the Tyler Street apartment, testified that the man depicted on this driver's license

8

"looked like" the man who signed the rental application.

HPD Detective John Kidd and Officer Wynne described the investigation into the Buchanan Street drug trafficking operation. Officer Wynne described the process for cooking cocaine powder into crack cocaine and noted that crack cocaine is frequently sold as a "cookie," which typically contains about twenty-eight grams of crack cocaine. Both officers testified that based on their observations of people regularly entering and leaving the Buchanan Street apartment and information provided by informants, they suspected narcotics dealing in the apartment. A confidential informant also made several controlled purchases of narcotics at the Buchanan Street apartment in the weeks prior to Bruce Bell's initial arrest.

Detective Kidd and Officer Wynne also testified about their participation in the raid and search conducted on September 17, 2004.[2] Officer Wynne described the items found in the Buchanan Street apartment, and Detective Kidd testified that he found the "Brian Elliot King" driver's license and a set of keys in Bruce Bell's pockets.

After obtaining consent to search the Tyler Street apartment, Officer Wynne

---

[2]The government also presented testimony from officers who executed the search warrant at the Buchanan Street apartments. HPD swat team members Jason Thomas and John Graham testified that they saw Bruce Bell throw crack cocaine into the Buchanan Street bedroom closet as he attempted to flee out the back door.

used one of the keys taken from Bruce Bell to open the rear door to the front Tyler Street apartment. Detective Kidd and Officer Wynne described the drugs and drug paraphernalia found in the Tyler Street apartment.

HPD Detective Wilde and DEA Agent Gifford also testified about Bruce Bell's incriminating statements after his two arrests. After the September 17, 2004 arrest, Detective Wilde testified that Bruce Bell confessed that he began selling crack cocaine in August 2003 and started "purchasing larger and larger amounts of powder cocaine to cook into crack" after his operation became successful. According to Detective Wilde, Bruce Bell admitted to purchasing kilograms of cocaine powder for $22,000 per kilogram to cook into crack cocaine. Following Bruce Bell's federal arrest on October 13, 2004, Agent Gifford testified that Bruce Bell admitted that the 7.5 ounces of cocaine powder found in the car was his and that the money found in his trunk was from drug proceeds.

Matthew Mulligan, a DEA forensic chemist, testified that in total, there were 91.22 grams of cocaine base and 201.9 grams of cocaine powder seized from the two apartments and Bruce Bell's vehicle.

The government also presented the testimony of codefendant Sheffield.[3] Sheffield, the half-brother of Anthony Bell and cousin of Bruce Bell, testified that

---

[3]Sheffield pled guilty and was ultimately sentenced to 30 months' imprisonment after his trial testimony.

10

Bruce Bell trained him to be his money collector for drug deliveries. Beginning in January 2004, Sheffield rode with Bruce Bell while making deliveries of crack cocaine. According to Sheffield, Bruce Bell cooked cocaine powder into crack cocaine and delivered crack cocaine to his approximately fifty-two or fifty-three customers. Following the delivery, Sheffield would collect an average of $350 from each of Bruce Bell's customers for half a cookie of crack cocaine each day, resulting in daily proceeds of $18,000 to $19,000 five days a week.

In June 2004, Bruce Bell told his co-conspirators that Anthony Bell would be handling future crack cocaine deliveries. Bruce Bell also hired Gustavo Fields to sell crack cocaine in the Buchanan Street apartment because he believed that Gustavo's young age would result in light punishment if police ever raided his operation. Sheffield also helped sell crack cocaine at the Buchanan Street apartment. Sheffield testified that Anthony and Bruce Bell managed the drug operation there. According to Sheffield, Bruce Bell possessed an uzi-like gun, and Sheffield saw Anthony Bell in possession of a gun on one occasion. Sheffield described Bruce Bell's efforts to avoid detection, including the use of surveillance cameras at both apartments and a bucket of boric acid kept on the premises to dissolve crack cocaine in case of a police raid. After Sheffield agreed to cooperate with prosecutors following his arrest, he received a threatening phone call from Bruce Bell warning him not to cooperate.

11

On cross-examination, defense attorneys impeached Sheffield's testimony by noting, <u>inter alia</u>, his prior false statements, his drug use, and his juvenile convictions.

After the government rested, Anthony and Bruce Bell presented no witnesses on their behalf. At the conclusion of trial, the jury convicted Anthony and Bruce Bell on both counts.

**G. Sentencing of Bruce Bell**

Because the jury found Bruce Bell guilty of drug offenses involving fifty grams or more of crack cocaine, Bruce Bell's convictions (as charged in the indictment and found by the jury) subjected him to a mandatory minimum sentence of ten years' imprisonment and a statutory maximum sentence of life imprisonment under 21 U.S.C. § 841(b)(1)(A). The presentence investigation report ("PSI") for Bruce Bell set his base offense level at 38, pursuant to U.S.S.G. § 2D1.1(c)(1), because his conspiracy offense involved the distribution of more than 1.5 kilograms of crack cocaine.[4] The PSI recommended that Bruce Bell's offense level be increased by: (1) 2 levels, pursuant to § 2D1.1(b)(1), based on his possession of a dangerous weapon; (2) 4 levels, pursuant to § 3B1.1(a), based on his leadership

_____

[4]The PSI reached this calculation based on Sheffield's testimony that Bruce Bell delivered half a cookie of crack cocaine to about fifty-two customers each day, five days a week, for several months. According to Officer Wynne, a whole cookie contains roughly twenty-eight grams of crack cocaine.

role in a criminal activity involving five or more participants; (3) 2 levels, pursuant to § 3B1.4, based on his use of a minor, Fields, to commit the offense; and (4) 2 levels, pursuant to § 3C1.1, based on obstruction of justice. Although these adjustments increased the offense level to 48, the PSI assigned Bruce Bell a total offense level of 43, the maximum allowable under the guidelines. See U.S.S.G. ch. 5, pt. A, cmt. n.2. With a total offense level of 43 and a criminal history category of VI, the advisory guidelines range was life imprisonment.

The PSI also listed Bruce Bell's six prior felony drug offenses.[5] Pursuant to 21 U.S.C. § 841(b)(1)(A), a person convicted of a § 841(a) drug offense after "two or more prior convictions for a felony drug offense . . . shall be sentenced to a mandatory term of life imprisonment . . . ." 21 U.S.C. § 841(b)(1)(A). Therefore, Bruce Bell's § 841(a) conviction along with the prior felony drug offenses triggered a mandatory sentence of life imprisonment.

At sentencing, the district court denied Bruce Bell's objections to (1) the 2-level enhancement for his possession of a dangerous weapon because Sheffield's testimony established that Bruce Bell had a firearm; (2) the 4-level enhancement

---

[5]The PSI noted that, pursuant to U.S.S.G. § 4B1.1, Bruce Bell was a career offender because at least two of his prior felony convictions were for a crime of violence or drug trafficking crime. However, because the career offender offense level of 37 was less than the otherwise applicable offense level of 48, the PSI recommended that the greater offense level of 48 be applied.

In the district court, Bruce Bell did not contest that he had the six prior felony drug offenses listed in the PSI.

for his leadership role because Sheffield's testimony and Bruce Bell's own statements indicated that his drug trafficking operation included Anthony Bell, Sheffield, Fields, Central Williams, and Dawn Ariquette; and (3) the 2-level enhancement for his use of a minor because Sheffield testified that Bruce Bell had hired Fields. The district court found that Bruce Bell had an offense level of 43 and a criminal history category of VI, resulting in an advisory guidelines' sentence of life imprisonment. After noting its consideration of the sentencing factors in 18 U.S.C. § 3553(a), the district court sentenced Bruce Bell to life imprisonment and ten years' supervised release.

### H. Sentencing of Anthony Bell

Because the jury found Anthony Bell guilty of drug offenses involving fifty grams or more of crack cocaine, Anthony Bell's convictions (as charged in the indictment and found by the jury) also subjected him to a mandatory minimum sentence of ten years' imprisonment and a statutory maximum sentence of life imprisonment under 21 U.S.C. § 841(b)(1)(A). The PSI for Anthony Bell set his base offense level at 38 based on the distribution of more than 1.5 kilograms of crack cocaine. See U.S.S.G. § 2D1.1(c)(1). The PSI also recommended a 2-level increase, pursuant to § 2D1.1(b)(1), based on possession of a dangerous weapon, and a 2-level increase, pursuant to § 3C1.1, based on obstruction of justice, for a total offense level of 42.

14

Pursuant to U.S.S.G. § 4B1.1, Anthony Bell was considered a career offender because he had two prior felony convictions for a crime of violence. Although his career offender status did not affect his offense level because he had a higher, otherwise applicable offense level of 42, his career offender status raised his criminal history category from V to VI, pursuant to § 4B1.1(b). With a total offense level of 42 and a criminal history category of VI, Anthony Bell's advisory guidelines range was 360 months' to life imprisonment.

At sentencing, the government presented the testimony of several witnesses. Richard O'Connor testified that he assisted an undercover purchase of crack cocaine from Anthony and Bruce Bell. Later that day, O'Connor returned to the Buchanan Street apartment, and Anthony and Bruce Bell accused him of being a snitch and brandished guns. O'Connor testified that Anthony and Bruce Bell drove him to a remote area, and Anthony Bell shot him in the chest. O'Connor survived the shooting and escaped into the woods. According to O'Connor, he later saw Anthony Bell in the Broward County Jail in September 2004, and Anthony Bell offered to pay him money not to testify.

DEA Agent Joanne Molina testified that following Anthony and Bruce Bell's guilty verdicts, Anthony Bell made a threatening phone call to Sheffield's house in which he stated that he was going to hurt Sheffield and his girlfriend because of Sheffield's cooperation.

Following this testimony, the district court denied all of Anthony Bell's objections. First, the district court concluded that the retroactive application of United States v. Booker, 543 U.S. 220, 125 S. Ct. 738 (2005), did not violate ex post facto principles in the Due Process Clause. Second, the district court determined that Anthony Bell qualified as a career offender, pursuant to U.S.S.G. § 4B1.1, because his two prior convictions for carrying a concealed weapon constituted crimes of violence.

Third, although the district court found insufficient evidence of Anthony Bell's alleged threatening phone call to Sheffield's house following the guilty verdict, the district court determined that sufficient testimony supported enhancements for possession of a dangerous weapon and obstruction of justice. The district court considered Anthony Bell's request for a variance from the advisory guidelines range based on (1) a racial disparity in the crack-to-powder cocaine sentencing ratio; (2) a sentencing disparity between Anthony Bell and codefendant Sheffield; and (3) an over-representation of his criminal history. The district court denied this variance request in light of the sentencing factors in 18 U.S.C. § 3553(a). The district court found that Anthony Bell had an offense level of 42 and a criminal history category of VI, and it sentenced him to 360 months' imprisonment, the low end of the advisory guidelines range, and five years' supervised release.

Bruce Bell filed a timely appeal of his convictions and sentences, and Anthony Bell appeals his sentences.

## II. DISCUSSION

### A. Bruce Bell's Challenge to His Convictions

On appeal, defendant Bruce Bell challenges his convictions and sentences. In his challenge to his convictions, Bruce Bell raises these assignments of error: (1) evidence seized from the front Tyler Street apartment should have been suppressed because the search exceeded the scope of his consent;[6] (2) Bruce Bell's post-arrest statements to Agent Gifford should not have been admitted because the government failed to furnish these statements before trial, pursuant to Fed. R. Crim. P. 16;[7] (3) Bruce Bell's post-arrest statements to Detective Wilde, after he allegedly invoked his right to counsel, should not have been admitted;[8] (4) in-court identifications by Brooks, Sheffield, and Zambrana should not have been admitted

---

[6]The district court's denial of a motion to suppress presents a mixed question of law and fact: we review the district court's factual findings for clear error, and the application of the law to those facts de novo. United States v. Perez, 443 F.3d 772, 774 (11th Cir. 2006).

[7]Where a defendant fails to object to alleged evidentiary errors in the district court, we review the district court's evidentiary rulings for plain error. United States v. Turner, __ F.3d __, No. 05-14388, 2007 WL 64430, at *9 (11th Cir. Jan. 11, 2007). "Plain error occurs where (1) there is an error; (2) that is plain or obvious; (3) affecting the defendant's substantial rights in that it was prejudicial and not harmless; and (4) that seriously affects the fairness, integrity, or public reputation of the judicial proceedings." United States v. Raad, 406 F.3d 1322, 1323 (11th Cir.), cert. denied, 126 S. Ct. 196 (2005) (quotation marks omitted).

[8]When a defendant fails to object to an alleged Miranda violation in the district court, we review the alleged violation for plain error. See United States v. Schier, 438 F.3d 1104, 1106 n.1 (11th Cir. 2006).

because of an unduly suggestive identification procedure;[9] and (5) the government presented insufficient evidence that Bruce Bell participated in a conspiracy to possess with intent to distribute crack cocaine because, inter alia, Sheffield's testimony was incredible as a matter of law.[10]

After careful review of the record, as well as the arguments of both parties presented in their briefs and at oral argument, we conclude that all of Bruce Bell's challenges to his convictions lack merit. Only his first claim challenging the search of the front Tyler Street apartment warrants further discussion.

On appeal, Bruce Bell contends that he has standing to challenge the search of the front Tyler Street apartment because the government presented testimony from Zambrana that Bruce Bell was the leaseholder, despite Bruce Bell's suppression hearing testimony that he did not lease the apartment. Alternatively, Bruce Bell asserts that he has Fourth Amendment standing as an overnight guest in the front Tyler Street apartment.

In order to establish standing to challenge a search under the Fourth Amendment, a defendant bears the burden of demonstrating a legitimate

---

[9]In this case, defendant Bruce Bell failed to challenge these in-court identifications in the district court, and we thus review the admission of these identifications for plain error. See Turner, 2007 WL 64430, at *9.

[10]We review a challenge to the sufficiency of the evidence de novo, and view all evidence and make all reasonable inferences in the light most favorable to the government. See United States v. Greer, 440 F.3d 1267, 1271 (11th Cir. 2006).

18

expectation of privacy in the area searched. See United States v. Cooper, 133 F.3d 1394, 1398 (11th Cir. 1998). A person has a legitimate expectation of privacy if (1) he or she has a subjective expectation of privacy, and (2) society is prepared to recognize that expectation as objectively reasonable. See United States v. Miravalles, 280 F.3d 1328, 1331 (11th Cir. 2002).

In this case, Bruce Bell testified at the suppression hearing, and maintains on appeal, that he was not the leaseholder of the front Tyler Street apartment and that his only connection to the apartment was a visit to help Sheffield move furniture. As a result of Bruce Bell's repeated denials of any ownership of the front Tyler Street apartment, he has expressly disclaimed a subjective expectation of privacy in the premises. See Rakas v. Illinois, 439 U.S. 128, 134, 99 S. Ct. 421, 425 (1978) ("A person who is aggrieved by an illegal search and seizure only through the introduction of damaging evidence secured by a search of a third person's premises or property has not had any of his Fourth Amendment rights infringed."). Bruce Bell cannot adopt the government's evidence that he leased the front Tyler Street apartment for the limited purpose of establishing standing while challenging the validity of this same evidence. Notwithstanding the government's evidence to the contrary, Bruce Bell has consistently denied any leasehold or interest in the front Tyler Street apartment, and we thus conclude that the district court's finding that he lacked a subjective expectation of privacy was not clearly erroneous.

Bruce Bell's contention that he has Fourth Amendment standing because he was an overnight guest in the front Tyler Street apartment also is unavailing. The Supreme Court has recognized that overnight guests in the homes of third persons can have a reasonable expectation of privacy in those premises. See Minnesota v. Olson, 495 U.S. 91, 96-97, 110 S. Ct. 1684, 1688 (1990). In order to establish a reasonable expectation of privacy, however, Bruce Bell would have to prove that he was a guest for personal reasons, not for a commercial purpose. See Minnesota v. Carter, 525 U.S. 83, 90-91, 119 S. Ct. 469, 474 (1998).

Here, the government provided ample testimony establishing that Bruce Bell used the front Tyler Street apartment in his drug operation. According to HPD Detective Wilde and DEA Agent Gifford, Bruce Bell twice confessed that he used the front Tyler Street apartment as a distribution site for crack cocaine after the Buchanan Street apartment attracted too much police attention. Accordingly, Bruce Bell had no reasonable expectation of privacy as an overnight guest because he was using the apartment primarily for commercial purposes. See United States v. Cooper, 203 F.3d 1279, 1285 n.3 (11th Cir. 2000) (noting that defendants likely would lack standing as overnight guests because evidence suggested that they were using the premises predominately to engage in narcotics trafficking).

Even if Bruce Bell had established Fourth Amendment standing, the district court determined that the search was within the scope of his consent. Bruce Bell

20

argues that the government exceeded the scope of his consent to search because he only consented to a search of the rear Tyler Street apartment. He contends that the "6205 Tyler St. (rear)" notation on the search consent form indicates that he only provided consent to search the rear Tyler Street apartment, which was not leased by or connected to him. However, HPD Detective Christianson, who prepared the search consent form, explained that he asked Bruce Bell how officers on the scene should enter the Tyler Street apartment, and Bruce Bell replied that a key found in Bruce Bell's pockets upon arrest opened the rear door. Detective Christianson then wrote "rear" on the search consent form to indicate that Bruce Bell's key opened the rear door. Based on Detective Christianson's explanation of his own notation, we conclude that the district court did not clearly err in finding that HPD officers could reasonably interpret the scope of Bruce Bell's consent to cover the entire front Tyler Street apartment.

**B. Bruce Bell's Sentencing Claims**

In addition to his challenge to his convictions, Bruce Bell also claims that the district court erred in sentencing. We first address Bruce Bell's two claims of Booker error, which were raised for the first time on appeal.[11]

---

[11]When a defendant fails to raise a Booker challenge in the district court, we review for plain error. See United States v. Rodriguez, 398 F.3d 1291, 1298 (11th Cir.), cert. denied, 545 U.S. 1127, 125 S. Ct. 2935 (2005).

By way of adoption, Bruce Bell argues that the application of the remedial holding in Booker constituted an ex post facto violation because Blakely v. Washington, 542 U.S. 296, 124 S. Ct. 2531 (2004) was the controlling law when he committed his offenses. Because Bruce Bell committed his offenses after Blakely but before Booker was decided, he argues that he had no fair warning that he would be sentenced under Booker's advisory guidelines regime with judicial factfinding.

We have repeatedly rejected similar ex post facto challenges to the retroactive application of Booker's remedial holding. See, e.g., United States v. Hunt, 459 F.3d 1180, 1181 n.1 (11th Cir. 2006) (rejecting an identical ex post facto claim when the unlawful conduct occurred after Blakely but before Booker); United States v. Thomas, 446 F.3d 1348, 1354-55 (11th Cir. 2006) (finding that defendant had sufficient warning of his potential sentence because of the statutory maximum), United States v. Martinez, 434 F.3d 1318, 1323-24 (11th Cir.) (same), cert. denied, __ U.S. __, 126 S. Ct. 2946 (2006). In this case, Bruce Bell had ample warning that life imprisonment was a possible consequence of his unlawful conduct. Because Bruce Bell had more than two prior felony drug convictions and the instant offenses involved more than 50 grams of crack cocaine, he faced a mandatory sentence of life imprisonment. See 21 U.S.C. § 841(a)(1), (b)(1)(A). Moreover, because Blakely never applied to the federal sentencing guidelines, the

22

guidelines in effect when Bruce Bell committed the offenses informed him that the district court could engage in factfinding. See Martinez, 434 F.3d at 1324; see also Blakely, 542 U.S. at 305 n.9, 124 S. Ct. at 2538 n.9 ("The Federal Guidelines are not before us, and we express no opinion on them."). Accordingly, Bruce Bell was on notice that he could receive a life sentence when he committed his offenses, and we find no ex post facto violation.

Bruce Bell also contends that the district court plainly erred under Booker in applying sentencing enhancements that were neither charged in the indictment nor found by the jury. In sentencing Bruce Bell, the district court clearly indicated that it applied the guidelines in an advisory fashion. When the district court applies the guidelines in an advisory manner, nothing in Booker prohibits the district court from imposing sentencing enhancements based on judicial factfinding by a preponderance of the evidence. United States v. Chau, 426 F.3d 1318, 1323-24 (11th Cir. 2005); United States v. Rodriguez, 398 F.3d 1291, 1301-02 (11th Cir.), cert. denied, 545 U.S. 1127, 125 S. Ct. 2935 (2005).

Bruce Bell also argues that the district court erred in applying a 2-level enhancement for possession of a firearm, pursuant to U.S.S.G. § 2D1.1(b)(1).[12] Specifically, Bruce Bell argues that the government failed to establish that Bruce

_____

[12]We review a district court's application and interpretation of the sentencing guidelines de novo, but its factual findings must be accepted unless clearly erroneous. See United States v. Ellis, 419 F.3d 1189, 1192 (11th Cir. 2005).

Bell possessed a firearm in connection with his offenses.

If evidence establishes that a defendant possessed a firearm, the district court may apply a 2-level enhancement under § 2D1.1(b)(1) "unless it is clearly improbable that the weapon was connected with the offense." U.S.S.G. § 2D1.1 cmt. n.3. Once the government shows that a firearm was present, the burden shifts to the defendant to show that a connection between the firearm and the offense is "clearly improbable." See United States v. Pham, 463 F.3d 1239, 1245 (11th Cir. 2006) (quotation marks omitted). In this case, the government provided uncontested testimony from co-conspirator Sheffield that Bruce Bell possessed an uzi-like gun. Bruce Bell provided no evidence or argument that a connection between this gun and his drug conspiracy offense is "clearly improbable." Moreover, we have recognized that "'guns are a tool of the drug trade. There is a frequent and overpowering connection between the use of firearms and narcotics traffic.'" Id. at 1246 (quoting United States v. Cruz, 805 F.2d 1464, 1474 (11th Cir.1986)). In light of the clear connection between the use of firearms and drug conspiracies, the district court did not abuse its discretion in applying the 2-level enhancement for possession of a firearm.

Even if the district court had erred in applying the enhancement, any such error is harmless. Even excluding the 2-level enhancement, Bruce Bell still would have a total offense level of 43, the maximum allowable under the guidelines. See

U.S.S.G. ch. 5, pt. A, cmt. n.2. Above all, any error in applying the guidelines is harmless because Bruce Bell was subject to a statutory mandatory life sentence based on the drug quantity charged in the indictment and found by the jury and his multiple prior felony drug convictions. See 21 U.S.C. § 841(a)(1), (b)(1)(A).

Finally, by way of adoption, Bruce Bell challenges the reasonableness of his life sentence in light of the 18 U.S.C. § 3553(a) factors.[13] After Booker, in determining a reasonable sentence, a district court must consider the correctly calculated advisory guidelines range and the factors in § 3553(a). See Booker, 543 U.S. at 258-64, 125 S. Ct. at 764-67; United States v. Talley, 431 F.3d 784, 786 (11th Cir. 2005). The party who challenges the sentence bears the burden of showing that it is unreasonable. United States v. Bonilla, 463 F.3d 1176, 1180 (11th Cir. 2006). Although a sentence within the advisory guidelines range is not per se reasonable, "ordinarily we would expect a sentence within the Guidelines range to be reasonable." Talley, 431 F.3d at 788.

After review, we conclude that Bruce Bell fails to show that his life sentence is unreasonable. The district court correctly calculated his advisory guidelines range and stated that it had considered the statements of all parties, as well as the § 3553(a) factors. Most importantly, the district court was required by statute to

_____

[13]We review sentences imposed under an advisory guidelines system for reasonableness. See United States v. Talley, 431 F.3d 784, 785 (11th Cir. 2005).

25

sentence Bruce Bell to a mandatory term of life imprisonment. See 21 U.S.C. § 841(a)(1), (b)(1)(A); see also United States v. Shelton, 400 F.3d 1325, 1333 n.10 (11th Cir. 2005) (concluding that post-Booker, district courts are still bound by the statutory minimum sentence).

For all these reasons, we affirm Bruce Bell's life sentence.

**C. Anthony Bell's Sentencing Claims**

Anthony Bell raises several challenges to his 360-month sentence. We first address his claim that the district court erroneously determined that he was a career offender, pursuant to U.S.S.G. § 4B1.1.

Anthony Bell argues that the district court erred in concluding that he was a career offender under § 4B1.1 because his two prior convictions for carrying a concealed firearm do not constitute "crimes of violence." A district court generally may enhance a defendant's sentence as a career offender if (1) the defendant was at least eighteen years old at the time of the instant offense of conviction; (2) the instant offense of conviction is a felony that is either a "crime of violence" or a controlled substance offense; and (3) the defendant has at least two prior felony convictions for either a "crime of violence" or a controlled substance offense. U.S.S.G. § 4B1.1(a). A felony conviction punishable for a term exceeding one year constitutes a crime of violence if it "has as an element the use, attempted use,

or threatened use of physical force against the person of another" or "is burglary of a dwelling, arson, or extortion, involves use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury to another." U.S.S.G. § 4B1.2(a).

Anthony Bell does not dispute that he has two prior felony convictions for carrying a concealed weapon. Moreover, he acknowledges that we have previously concluded that carrying a concealed weapon is a crime of violence for purposes of the career-offender guideline. See United States v. Adams, 316 F.3d 1196, 1197 (11th Cir. 2003); United States v. Gilbert, 138 F.3d 1371, 1372 (11th Cir. 1998). Although Anthony Bell asks this Court to reconsider this binding precedent, a prior panel opinion may only be overruled by the Supreme Court or by this Court sitting en banc. See Adams, 316 F.3d at 1197 n.1. Following our precedent, Anthony Bell's two prior felony convictions for carrying a concealed weapon constitute "crimes of violence." Accordingly, the district court did not err in applying the U.S.S.G. § 4B1.1 career-offender enhancement.[14]

Anthony Bell also contends that his 360-month sentence is unreasonable in light of the § 3553(a) factors. Specifically, he asserts that a lesser sentence is

---

[14]Additionally, we note that even if the district court had erred in applying the § 4B1.1 enhancement, any error would be harmless. Even without the § 4B1.1 enhancement, Anthony Bell would have a criminal history category of V and a total offense level of 42, resulting in the same advisory guidelines range of 360 months' to life imprisonment.

warranted because (1) the offense was merely a neighborhood drug distribution, not a large-scale operation; (2) he had a troubled upbringing with a single mother addicted to drugs; and (3) he would benefit from rehabilitation.

After review, we conclude that Anthony Bell has not proven that his 360-month sentence is unreasonable. The district court correctly calculated his advisory guidelines range and indicated that it had considered several § 3553(a) factors, including (1) the nature and circumstances of the offense, 18 U.S.C. § 3553(a)(1); (2) the history and characteristics of the defendant, id.; and (3) the need to avoid unwarranted sentencing disparities among codefendants, id. § 3553(a)(6). Although the district court did not explicitly discuss each § 3553(a) factor, it was not required to engage in a detailed, step-by-step analysis of every factor. See United States v. Scott, 426 F.3d 1324, 1329 (11th Cir. 2005). Moreover, we ordinarily expect a sentence within the advisory guidelines range to be reasonable, and Anthony Bell was sentenced at the low end of the guidelines range. See Talley, 431 F.3d at 788.[15]

_____

[15]Anthony Bell also raised the identical ex post facto and extra-verdict enhancements challenges in district court and on appeal that Bruce Bell adopted on appeal. We review de novo a claim that a defendant's sentence violated ex post facto principles. See Thomas, 446 F.3d at 1351. As discussed above, we have previously rejected an ex post facto challenge to the retroactive application of Booker's remedial holding when the offense conduct occurred after Blakely but before Booker. See Hunt, 459 F.3d at 1181 n.1. Additionally, we have recognized that a district court may impose sentencing enhancements based on judicial factfinding after Booker when the district court applies the guidelines in an advisory fashion. See Chau, 426 F.3d at 1323-24.

For all these reasons, we affirm Anthony Bell's sentences.

## III. CONCLUSION

Accordingly, we affirm Bruce Bell's convictions and sentences, and we affirm Anthony Bell's sentences.

**AFFIRMED.**