[DO NOT PUBLISH]



IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JANUARY 11, 2012
JOHN LEY
CLERK

No. 11-11075
Non-Argument Calendar
_____

D.C. Docket No. 2:09-cr-00083-JES-DNF-1



UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

MARIA CONTRERAS,

Defendant-Appellant.


_____

Appeal from the United States District Court
for the Middle District of Florida
_____

(January 11, 2012)

Before BARKETT, HULL and ANDERSON, Circuit Judges.

PER CURIAM:

Without a plea agreement, Maria Contreras pled guilty to one count of loan and credit application fraud, in violation of 18 U.S.C. § 1014. Contreras appeals her sentence of 18 months' imprisonment on the ground that the district court did not properly calculate the financial loss caused by Contreras's fraud.

After review of the record, we affirm Contreras's 18-month sentence.

## I. BACKGROUND

At the relevant times, Defendant Contreras was an employee of Atlantic Pacific Mortgage Company ("APMC"), a mortgage intermediary between the borrowers and various lenders. Contreras helped borrowers fill out applications for home loans, which were then forwarded to the lenders and the Federal Housing Administration ("FHA").

A single-count information charged Contreras with loan and credit application fraud, in violation of 18 U.S.C. § 1014. The information alleged that Contreras had knowingly "stated and represented, and caused to be stated and represented" that the monthly income of "R.A.," the recipient of a loan insured by the FHA, was substantially more than R.A.'s actual income.

Defendant Contreras's Presentence Investigation Report ("PSI") found that

Contreras had arranged false employment information and other false documentation in connection with six FHA-insured loans.[1] Each of the six loan recipients for which Contreras provided false information defaulted on his loan. For five of these loans, the default triggered an insurance payment from the FHA to the lender bank. In part to calculate the loss amount, the PSI documented the history of these six loans as follows.[2]

## A. Borrower "R.A."[3]

On or about March 28, 2006, Defendant Contreras and R.A. completed a hand-written home mortgage loan application. R.A. had also signed a separate, blank mortgage loan application. Contreras then forwarded both documents to APMC's home office. Thereafter, APMC's home office returned to Contreras R.A.'s signed application but with inflated values substituted for R.A.'s actual monthly income. Contreras knew that the information in R.A.'s final loan application was false and that the mortgage lender would rely upon the false

---

[1] In January 2010, Juan Gonzalez, the owner of APMC, pled guilty to two counts of loan and credit application fraud.

[2] Contreras did not object to the PSI's recitation of facts setting forth her offense conduct in paragraphs 5 to 45 of the PSI.

[3] The full names of the six borrowers connected to Contreras's fraud appear only in the PSI, which is under seal. We refer to them by initials.

information.

R.A.'s FHA loan file also contained a letter from R.A.'s cousin, Gladys Lobelo. The letter stated that Lobelo had given R.A. $7,000. R.A. later told investigators that he never heard of Gladys Lobelo and never received a gift from Lobelo.

Through APMC as the intermediary, R.A. obtained an FHA-insured mortgage loan from US Bank N.A. in the amount of $339,669. After R.A. defaulted on this loan, the FHA, as insurer, paid US Bank N.A. for an insurance claim in the amount of $382,227.93. On or about April 19, 2009, R.A.'s property was sold for $64,161.08, resulting in a net loss of $321,986.16 to the FHA.

## B. Borrower "M.M."

On or about June 9, 2006, M.M. signed a blank home mortgage loan application and gave the application to Defendant Contreras. Contreras signed the application in the "To Be Completed by Interviewer" section. M.M. told investigators that M.M. provided Contreras with M.M.'s actual employment information.

However, the signed mortgage loan application actually submitted to the FHA stated that M.M. had been employed by Dalia Building Company for two years and three months as a warehouse manager and during that time earned a

4

monthly salary of $6,424.77. In fact, M.M. never worked for Dalia Building Company, and M.M.'s monthly income was substantially less than $6,424.77. M.M. denied providing the false information represented in the FHA loan application.

Through APMC as the intermediary, M.M. obtained an FHA-insured loan from Chase Home Finance LLC in the amount of $243,041. After M.M. defaulted on this loan, the FHA paid Chase Home Finance LLC for an insurance claim in the amount of $273,631.86. On or about April 19, 2009, M.M.'s property was sold for $51,663.86, resulting in a net loss to the FHA of $221,968.

## C. Borrower "D.O."

On or about September 29, 2006, D.O. signed a home mortgage loan application. Defendant Contreras signed D.O.'s application in the "To Be Completed by Interviewer" section.

The application actually submitted to the FHA stated that D.O. had been employed by Venamaica for three years at a salary of $4,445 per month. In fact, D.O.'s monthly salary was substantially less. Further, the application stated that D.O. intended to occupy the mortgaged property as his primary residence. In fact, D.O. purchased the property as an investment and did not intend to live on the property. Contreras knew that the information in D.O.'s loan application was false

5

and that the mortgage lender would rely on the information.

Through APMC as the intermediary, D.O. obtained an FHA-insured loan from US Bank N.A. in the amount of $157,528. After D.O. defaulted on this loan, the FHA paid US Bank N.A. an insurance claim in the amount of $169,321.33. On or about April 19, 2009, D.O.'s property was sold for $27,479.96, resulting in a net loss of $141,841.37 to the FHA.

## D. Borrower "C.J."

Defendant Contreras completed a hand-written home mortgage loan application with C.J.. The application submitted to the FHA and signed by C.J. represented C.J.'s monthly income as $8,618.18. In fact, C.J.'s monthly income was substantially less. C.J.'s application stated that C.J. had worked for West Coast Business Solutions. Luis Diaz, the President of West Coast Business Solutions, told investigators that he did not know who C.J. was and that the signature represented as Diaz's signature on C.J.'s application was forged. Contreras knew that the information in C.J.'s loan application was false and that the mortgage lender would rely on the information.

Through APMC as the intermediary, C.J. obtained an FHA-insured loan from US Bank N.A. in the amount of $305,210. After C.J. defaulted on this loan, the FHA paid US Bank N.A. an insurance claim in the amount of $325,592.13.

6

On or about April 19, 2009, C.J.'s property was sold for $110,500.00, resulting in a net loss of $215,092.13 to the FHA.

**E. Borrower "M.B."**

Defendant Contreras completed a hand-written home mortgage loan application with M.B. The application submitted to the FHA stated that M.B's monthly income was $7,390.85. In fact, M.B.'s monthly income was substantially less. Contreras knew that the information in M.B.'s loan application was false and that the mortgage lender would rely on the information.

Through APMC as the intermediary, M.B. obtained an FHA-insured loan from US Bank N.A. in the amount of $240,555. After M.B. defaulted on this loan, the FHA paid US Bank N.A. an insurance claim in the amount of $275,643.60. M.B.'s property was sold for $148,000.00, resulting in a net loss of $127,643.60 to the FHA.

**F. Borrower "J.M."**

On or about June 6, 2006, J.M. signed a blank home mortgage application and gave the application to Defendant Contreras. Contreras signed J.M.'s application in the "To Be Completed by Interviewer" section.

The loan application, submitted to the FHA and signed by J.M., stated that J.M. had been employed by West Coast Business Solutions for two years and was

paid a monthly salary of $6,945.81 during that time. Although J.M. had worked

for West Coast Business Solutions, his monthly salary was substantially less than

$6,945.81.

J.M. obtained an FHA-insured loan from US Bank N.A. in the amount of

$266,437. J.M. later defaulted on this loan. According to the Lee County, Florida

Property Appraiser's Office, J.M.'s property's value at the time the PSI was

prepared was $72,522.[4] As a result, the estimated loss to US Bank N.A. for J.M.'s

loan was approximately $193,915.

## II. SENTENCING

### A. PSI Calculations[5]

The PSI assigned Contreras a base offense level of 7. The PSI determined

that U.S.S.G. § 2B1.1 was the applicable sentencing guideline for a violation of 18

U.S.C. § 1014. Under U.S.S.G. § 2B1.1, if the statutory maximum term of

imprisonment is 20 years or more, then the defendant's base offense level is 7.

Because the maximum term of imprisonment for a violation of § 1014 is 30 years,

the PSI assigned Contreras a base offense level of 7.

---

[4] The PSI indicated that the FHA insurance claim for the J.M. property had not yet been filed and the property had not been sold.

[5] The PSI calculations were properly based on the guidelines manual that went into effect on November 1, 2010, and applied at the time of Contreras's sentencing.

The PSI applied a 16-level increase to Defendant Contreras's base offense level because the amount of financial losses due to Contreras's relevant conduct was more than $1 million but less than $2.5 million. See U.S.S.G. § 2B1.1(b)(1)(I). To calculate the financial losses, the PSI added the FHA insurance claim amounts less the subsequent sale price of the properties; these five loss amounts together totaled $1,028,531.26.[6] Because the FHA insurance claim for the J.M. property was not yet filed and the property not yet sold, the PSI calculated the loss for the J.M. property as $193,915, which represented the loan amount less the property's current value. The PSI calculated the total loss as $1,222,446.26. This 16-level increase raised Contreras's offense level to 23.

Pursuant to U.S.S.G. § 3E1.1(a) and (b), the PSI reduced Defendant Contreras's offense level by three levels for her acceptance of responsibility, yielding a total adjusted offense level of 20.

Contreras had no criminal history points. Accordingly, her criminal history category was I. Contreras's resulting guidelines range was 33 to 41 months' imprisonment.

---

[6] This $1,028,531.26 calculation included these loss amounts:
R.A.: $382,227.93 – $64,161.08 = $321,986.16
M.M.: $273,631.86 – $51,663.86 = $221,968.00
D.O.: $169,321.33 – $27,479.96 = $141,841.37
C.J.: $325,592.13 – $110,500.00 = $215,092.13
M.B.: $275,643.60 – $148,000.00 = $127,643.60.

## B. Objections and Stipulation

Prior to sentencing, Defendant Contreras objected to the 16-level increase under U.S.S.G. § 2B1.1(b)(1)(I) for causing a loss of more than $1 million but less than $2.5 million.[7]  In her written objections to the PSI, Contreras argued that the loss calculation in the PSI should not have been based on the lender banks' insurance claims against the FHA because those claims included fees and costs that were not cognizable losses under the sentencing guidelines.  Contreras claimed that, at most, she should receive (1) a 12-level increase, which reflects losses of $200,000 to $400,000, or (2) a 14-level increase, which reflects losses of $400,000 to $1 million.  See U.S.S.G. § 2B1.1(b)(1)(G), (H).

An Addendum to the PSI explained that, in the event the district court agreed with Defendant Contreras's objection and subtracted the fees and costs from the loss amount, the revised loss amount would be $1,078,113.10.[8]  Accordingly, the offense level increase would remain 16 levels because the loss amount would still be $1 million to $2.5 million.  See U.S.S.G. § 2B1.1(b)(1)(I).

At the sentencing hearing on February 7, 2011, Defendant Contreras

---

[7] Beside the loss calculation, Contreras objected only to the PSI's calculation of restitution.

[8] This calculation reflected the total loan amount of the properties, rather than the insurance claim amount, less the amount the first five properties were sold for and the current value of the J.M. property.

10

maintained her objection to the 16-level increase based on the PSI's loss calculations. Her counsel argued that the figures for the post-default sale amount of the properties were net sale-proceed figures, which did not include certain fees and costs that were subtracted from the sale amount. If added back to the sale value, this would have led to a loss calculation lower than $1 million. Her counsel explained the problem in light of the revised loss amount's proximity to the $1 million threshold necessary for a 16-level increase:

> Quite honestly, if the amount were substantially over $1 million, I would not be presenting this argument to the Court; but since it's so close to the $1 million figure, I'm concerned that, if we were to look at the fees that are rolled – or subtracted from the sold amount in arriving at those numbers, that I'm concerned that it would not meet the $1 million threshold.

After conferring privately with the prosecutor, Contreras's counsel asked the court "to consider allowing the representation that the government's made that [the loss level] be . . . just below $1 million, as opposed to over it." Contreras's counsel continued, "we would ask the Court to consider that as the range. And that would reduce [the offense level increase by] two levels." After further discussion, the prosecutor stated that he "would have no objection to the departure to the next level down just to cure" any possible miscalculation of the loss level.

The district court then asked Contreras's counsel whether agreeing to a loss level of below $1 million is "what you and your client wish to do." Contreras's

counsel, who had conferred with Contreras after discussing the loss amount with the prosecutor, confirmed that Contreras would stipulate to a loss amount of more than $400,000 but less than $1 million.

As a result of the loss stipulation, the district court found that Defendant Contreras was subject to an offense level increase of 14, rather than 16, pursuant to U.S.S.G. § 2B1.1(b)(1)(H). This modification resulted in a total adjusted offense level of 18, yielding an advisory guidelines range of 27 to 33 months' imprisonment.[9]

Contreras requested a sentence of probation or home detention. The district court concluded that in light of Contreras's lack of criminal history, a downward variance was appropriate. However, the district court noted Contreras's repetitive fraudulent conduct and sentenced her to 18 months' imprisonment, a variance of nine months below the advisory guidelines range. Contreras objected to the sentence as excessive.[10]

### III. DISCUSSION

Defendant Contreras appeals her 18-month sentence. For the first time on

---

[9] The PSI was modified to reflect the loss-amount stipulation and resulting change to the guidelines calculation.

[10] Following a later hearing, the district court further ordered Defendant Contreras to pay restitution in the amount of $271,910.52. Contreras does not appeal this order.

appeal, Contreras claims that the district court erroneously calculated the loss amount used to determine her guidelines range. Under the guidelines, loss equals the greater of actual loss or intended loss. U.S.S.G. § 2B1.1, cmt. (n 3(A)). Under the commentary to U.S.S.G. § 2B1.1, actual loss is the "reasonably foreseeable pecuniary harm that resulted from the offense." Id., cmt. (n. 3(A)(i)). Contreras claims that because she intended no loss and the actual loss was attributable to an unforeseeable decline in the real estate market, her offense level should not have been increased at all under § 2B1.1. Contreras also argues that the district court did not apply the restrictive definition of "actual" loss under U.S.S.G. § 2B1.1, which requires the loss to be reasonably foreseeable.

We reject Contreras's arguments for several reasons. First, Contreras invited any alleged error in the district court and thus may not challenge it.[11] The record shows that Defendant Contreras urged the district court to adopt the loss level and the resulting guidelines calculation she now appeals. Contreras's

---

[11] If a defendant fails to object to a sentencing error before the district court, we review only for plain error. See United States v. Castro, 455 F.3d 1249, 1251 (11th Cir. 2006). However, a party may not challenge as error a ruling if such error was invited by that party. United States v. Baker, 432 F.3d 1189, 1216 (11th Cir. 2005). We have explained that where a party "induce[s] the court to rely on a particular erroneous proposition of law or fact, a party in the normal case may not at a later stage of the case use the error to set aside the immediate consequences of the error." In re Carbon Dioxide Industry Antitrust Litigation, 229 F.3d 1321, 1326 (11th Cir. 2000) (quotation mark omitted). "Where invited error exists, it precludes a court from invoking the plain error rule and reversing." Baker, 432 F.3d at 1216.

13

counsel asked the district court "to consider allowing the representation that the government's made that [the loss level] be . . . just below $1 million, as opposed to over it." Contreras's counsel continued, "we would ask the Court to consider [less than $1 million] as the range. And that would reduce [the offense level increase by] two levels." Contreras even stipulated to this loss range and the resultant offense-level increase of 14 rather than 16. Contreras's counsel verbally confirmed this stipulation and its effect on Contreras's offense level to the district court. Finally, the district court relied on Contreras and the government's stipulation and adjusted Contreras's offense level to 18. In sum, Contreras invited the court to rely on the loss calculation and guidelines calculation she now appeals. Accordingly, we are precluded from reviewing the purported error.

Even assuming, arguendo, that Defendant Contreras did not invite the district court to rely on the stipulated loss amount, we conclude the district court did not plainly err by finding that the appropriate loss amount was $400,000 to $1 million.[12] Contreras claims that because she could not have reasonably foreseen the market factors that caused the actual loss, her offense level should not

_____

[12] To establish plain error, a defendant must show that there was "(1) error, (2) that is plain and (3) that affects substantial rights. If all three conditions are met, an appellate court may then exercise its discretion to notice a forfeited error, but only if (4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." United States v. Turner, 474 F.3d 1265, 1276 (11th Cir. 2007) (quotation marks omitted).

14

have been increased under U.S.S.G. § 2B1.1(b)(1).

Defendant Contreras has not demonstrated that the district court plainly erred in calculating the actual loss. First, nothing in the record suggests that the district court did not adhere to the applicable guidelines or further guidance in the commentary. There is also no evidence that the losses here were occasioned entirely by market factors outside Contreras's control. In any event, Contreras cites no controlling precedent in criminal cases in this circuit or the Supreme Court that required the district court to conclude that a decline in real estate prices renders losses on fraudulent loans not foreseeable. See United States v. Lejarde-Rada, 319 F.3d 1288, 1291 (11th Cir. 2003) ("[W]here the explicit language of a statute or rule does not specifically resolve an issue, there can be no plain error where there is no precedent from the Supreme Court or this Court directly resolving it."). There is certainly no such precedent under U.S.S.G. § 2B1.1.

### III. CONCLUSION

For the foregoing reasons, we **AFFIRM** Contreras's sentence of 18 months' imprisonment.

**AFFIRMED**